Commonwealth v. Catanzaro.

COMMONWEALTH vs. SHANE W. CATANZARO.

Barnstable. October 7, 2003. - February 13, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Controlled Substances. Practice, Criminal,* Motion to suppress. *Constitutional Law,* Search and seizure, Probable cause. *Search and Seizure,* Probable cause, Warrant. *Probable Cause. Words,* "Occupant."

There was no error in a Superior Court judge's finding that a criminal defendant's girl friend was an occupant of the apartment for which the police held a search warrant, where she spontaneously acknowledged residing at the apartment upon learning of the search warrant. [50-52]

The detention of a criminal defendant's girl friend fifty to seventy feet down the driveway outside the couple's apartment while police executed a valid warrant to search the apartment did not violate the Fourth Amendment to the United States Constitution, where the police stopped the girl friend as soon as was practicable after she left the apartment [52-53]. COWIN, J., dissenting, with whom MARSHALL, C.J., joined.

A Superior Court judge's ruling on a pretrial motion to suppress cocaine that police officers seized from the purse of a criminal defendant's girl friend was premised on clearly erroneous findings of fact, where no evidence supported the finding that the police had reason to believe that the defendant and his girl friend would be home at the time the police executed a search warrant for their apartment, or that the police planned to watch the apartment so as to detain the defendant outside the premises and have him provide access to the apartment in order to execute the search warrant. [54-55]

Police acted reasonably for purposes of art. 14 of the Massachusetts Declaration of Rights in detaining a criminal defendant's girl friend in the driveway outside the couple's apartment while a valid search warrant was executed, where the girl friend's spontaneous acknowledgment that it was her apartment provided a basis for detaining her, because a neutral, detached magistrate had already determined there was probable cause to believe narcotics were being sold there; therefore, a Superior Court judge erred in granting the defendant's motion to suppress evidence of cocaine found in the girl friend's purse. [55-58] IRELAND, J., dissenting. COWIN, J., dissenting, with whom MARSHALL, C.J., joined.

INDICTMENT found and returned in the Superior Court Department on January 8, 2001.

A pretrial motion to suppress evidence was heard by *Robert J. Kane*, J.

An application for leave to prosecute an interlocutory appeal was allowed by *Spina*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him.

*Julia K. Holler*, Assistant District Attorney, for the Commonwealth.

*Edward F.X. Lynch* for the defendant.

Spina, J. The Commonwealth was granted leave to appeal from an order of a judge in the Superior Court suppressing over twenty-eight grams of cocaine seized from the purse of the defendant's girl friend, Meredith Gravina. Police seized the evidence during a search of the couple's apartment pursuant to a warrant that expressly authorized police to search "any person present." Police had detained the defendant and Gravina in the driveway outside their apartment building in Hyannis, shortly after they saw them leave through the front door. During their conversation with the officers, both the defendant and his girl friend acknowledged that the apartment was theirs. After showing them the warrant, reading them both their Miranda rights, and placing the defendant in handcuffs for safety purposes, police walked the pair back to the apartment for the ensuing search.

The motion judge, relying on *Michigan* v. *Summers*, 452 U.S. 692 (1981), determined that the detention of Gravina outside the apartment did not violate the Fourth Amendment to the United States Constitution. He concluded, however, that art. 14 of the Massachusetts Declaration of Rights required the police, when applying for a search warrant, to obtain judicial authority to detain people encountered outside as well as inside the premises. Finding that the police failed to request such authority, the judge ruled that the detention of Gravina was illegal, and suppressed the evidence seized from her purse.[1]

A single justice allowed the Commonwealth's application under G. L. c. 278, § 28E, and Mass. R. Crim. P. 15 (a) (2), as

---

[1] The judge correctly noted that, because possession of cocaine was an essential element of the charge against the defendant, he had automatic standing to contest the legality of both the search and seizure of evidence from Gravina's purse, see *Commonwealth* v. *Amendola*, 406 Mass. 592, 596-601 (1990),

appearing in 422 Mass. 1501 (1996), to pursue an interlocutory appeal from the order granting the motion to suppress, and the appeal was reported to the full court. We affirm the judge's decision as to the Fourth Amendment, and because we conclude that the police acted reasonably in the circumstances, conformably with art. 14, we vacate the order for suppression and remand the case to the Superior Court for entry of an order denying the motion to suppress.

1. *Facts.* We recount the facts as found by the motion judge, supplemented by uncontroverted testimony from the hearing on the motion. See *Commonwealth* v. *Watson*, 430 Mass. 725, 726 n.5 (2000). In September, 2000, Detective Sean E. Balcom of the Barnstable police department began investigating the defendant after an informant reported that the defendant sold cocaine out of the apartment he shared with his girl friend.[2] Another informant, who had provided information in the past resulting in another individual's conviction of trafficking in cocaine, also told Barnstable police that the defendant sold cocaine out of his apartment. This informant additionally reported that the defendant had purchased a handgun for protection after he was robbed at gunpoint by other drug dealers. The robbery was verified by Barnstable police department records.

Following two controlled purchases of cocaine from the defendant using an informant, the Cape Cod drug task force obtained a "no-knock" warrant to search the defendant's apartment for cocaine. The warrant, which permitted police to conduct the search at night as well as to enter the premises without announcement, also authorized them to search the defendant specifically and "any person present who may be found to have such property [cocaine] in his or her possession or under his or her control or to whom such property may have been delivered."

Balcom testified that on October 5, 2000, he and other members of the task force arrived in the vicinity of the apartment building with the search warrant at approximately

and the detention of Gravina that made the search possible. See *Commonwealth* v. *Santaliz*, 413 Mass. 238, 240 n.5 (1992).

[2] The affidavit for the search warrant did not identify the girl friend by name.

4:15 P.M. They set up surveillance to determine whether anyone was inside. The apartment was on the lower level of a two-story, multi-unit building located behind a restaurant on Main Street in Hyannis. An alley or driveway approximately one hundred feet long runs alongside the restaurant and ends in a parking area in front of the apartment building.

Balcom further testified that at approximately 4:50 P.M., he saw the defendant and a woman, later identified as Meredith Gravina, the defendant's girl friend, leave the apartment. The two were on the front step "for a short period of time," according to Balcom, and then began walking toward Main Street.[3] After Balcom radioed the other officers, he and two lieutenants approached the pair when they were about one-half to three-quarters of the way down the driveway, just "[a]bout three minutes" after they left the apartment, according to the judge.[4]

The motion judge found that as Balcom, Lieutenant John Allen of the State police, and another lieutenant converged on the defendant and Gravina, Allen immediately informed the pair that police had a warrant to search apartment no. 5. Gravina "blurted out" that it was her apartment. Allen testified that he then showed the search warrant to the defendant and Gravina, and read them both their Miranda rights. At that time, the defendant (but not Gravina) was patted down and handcuffed for safety reasons.[5]

Gravina told the officers she had a puppy inside the apartment and expressed concern about the police going in, according to the officers' testimony. Allen testified that he asked her to accompany them back to the apartment and she agreed to do so. The group, which now included three more police officers, began making its way up the driveway. Balcom and a State

[3]Detective Balcom testified that he recognized the defendant but not Gravina.

[4]Balcom testified that it was "a couple of minutes."

[5]Although the defendant challenged the validity of his detention in his motion to suppress, the motion judge confined his analysis to the detention of Gravina, and the defendant does not raise the issue on appeal. The police had probable cause to arrest him in any event, based on the information gathered in their investigation. See Commonwealth v. Crawford, 417 Mass. 40, 41 (1994).

trooper led the defendant, while Gravina, Allen, and two other officers walked behind them. As they walked, Allen asked Gravina for a key to the apartment, which she produced. Allen unlocked the door and the group, led by one of the officers, entered the apartment.

Once inside, Balcom testified that he and another officer took the defendant into the bathroom to be searched more thoroughly, while other officers interviewed Gravina in the kitchen. Balcom found $108 in cash and a plastic bag of marijuana on the defendant and placed him under arrest. Balcom testified that he then asked the defendant "where the cocaine was." He replied that it was in Gravina's purse, but that it belonged to him and "she had no idea about his drug dealing." As a result of the disclosure, officers searched Gravina's purse, where they discovered two bags containing over twenty-eight grams of cocaine. A further search of the premises turned up $1,170 in cash in a bedroom closet and $2,174 inside an envelope in a bureau drawer.

The defendant was charged with trafficking in cocaine, G. L. c. 94C, § 32E (*b*) (2), and possession of marijuana, G. L. c. 94C, § 34.[6] He filed a motion to suppress the evidence, arguing that police lacked probable cause to detain Gravina and search her purse. The defendant also claimed in a supplemental memorandum that he and Gravina were illegally detained under Massachusetts law.

2. *Discussion.* When reviewing a motion to suppress evidence, we adopt the motion judge's subsidiary findings of fact absent clear error, but we independently determine the correctness of the judge's application of constitutional principles to the facts as found. See *Commonwealth* v. *Haas,* 373 Mass. 545, 550 (1977), *S.C.,* 398 Mass. 806 (1986), and cases cited. See also *Commonwealth* v. *Eckert,* 431 Mass. 591, 592-593 (2000).

The motion judge found, and the Commonwealth does not dispute, that Gravina was seized outside the apartment for purposes of the Fourth Amendment and art. 14 of the Mas-

---

[6]The case against Gravina was disposed of in the District Court.

sachusetts Declaration of Rights.[7] The Commonwealth argues
that upholding the detention of Gravina under the principles
articulated in *Michigan v. Summers*, 452 U.S. 692 (1981), would
not offend art. 14. The defendant, on the other hand, argues that
the judge erred in ruling that under *Michigan v. Summers*, *supra*, the seizure did not violate the Fourth Amendment.[8] We address each issue separately.

a. *Fourth Amendment.* The motion judge ruled that because
Gravina was an occupant of the apartment, her detention while
police executed the search warrant did not violate the Fourth
Amendment. See *Michigan v. Summers*, *supra* at 705. Contrary
to the defendant's claim, the judge did not err in finding that
Gravina was an occupant.[9] Black's Law Dictionary 1106 (7th
ed. 1999) defines "occupant" as "[o]ne who has possessory
rights in, or control over, certain property or premises." Webster's Third New International Dictionary 1560 (1993) defines
"occupant" as "one who takes possession under title, lease, or
tenancy at will" and "one who occupies a particular place or
premises: TENANT, RESIDENT."[10] On learning of the search
warrant, Gravina stated, "That's my apartment," and the

[7]The judge concluded that because of the "substantial" police presence in
the driveway, the giving of Miranda warnings, the display of the search warrant, and the restraint of the defendant, a reasonable person would have
believed she was not free to leave. See *Commonwealth v. Stoute*, 422 Mass.
782, 789 (1996); *Commonwealth v. Borges*, 395 Mass. 788, 791 (1985).

[8]The defendant did not file a cross appeal from the judge's ruling on the
Fourth Amendment issue, but merely sets forth another ground on which to
sustain the suppression order. See *Commonwealth v. Mottola*, 10 Mass. App.
Ct. 775, 781 (1980). To avoid the "possibility of continuing controversy over
the same evidence," *Commonwealth v. Boswell*, 374 Mass. 263, 267 (1978),
we will permit him to raise the propriety of the seizure "under the umbrella of
the government's appeal." *Commonwealth v. Mottola*, *supra* at 782, quoting
*United States v. Moody*, 485 F.2d 531, 534 (3d Cir. 1973).

[9]The defendant also claims the judge erroneously found Gravina was "the
subject" of the search warrant. Even if the defendant is correct, the finding
has no bearing on our analysis. See *Michigan v. Summers*, 452 U.S. 692, 694-695 (1981) (warrant's authority to search persons on premises fails to justify
detention outside premises).

[10]Professor LaFave argues against interpreting "occupant" to mean "visitor" when applying the rule of *Michigan v. Summers*:

"Especially because the Court elsewhere refers to the category of
persons covered as 'residents' who would ordinarily 'remain in order to
observe the search of their possessions,' it would seem that the word

defendant does not challenge that Gravina made that statement.[11] Thus, the judge's finding that Gravina was an occupant of the apartment is supported by the record.

The United States Supreme Court has held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan* v. *Summers, supra* at 705. In *Michigan* v. *Summers, supra* at 693, police officers who were about to execute a warrant to search the defendant's home for narcotics encountered the defendant going down his front steps. They asked him to let them in, and detained him while they searched the home. *Id.* On discovering drugs in the basement, the police arrested the defendant and searched him, finding an envelope containing heroin in his pocket. *Id.*

The Court stated that both the law enforcement interests and the nature of "articulable facts" to support the detention of the occupants are relevant in evaluating the seizure. *Michigan* v. *Summers, supra* at 702. The government has an interest in preventing flight by the occupants, minimizing the risk of harm to the officers, and facilitating the orderly completion of the search. See *id.* at 702-703. As for the nature of the articulable

'occupants' is not to be loosely construed as covering anyone present, but instead is to be interpreted literally."

2 W.R. LaFave, Search and Seizure § 4.9(e), at 650 (3d ed. 1996).

[11]The defendant also does not challenge the judge's finding that Gravina identified herself as an occupant before police displayed the search warrant and informed her of her Miranda rights, and before they handcuffed and pat frisked the defendant, all of which factored into the judge's conclusion that Gravina had been seized for purposes of constitutional review. Contrary to Justice Cowin's dissent, the finding is supported by the record and therefore is not clearly erroneous. *Post* at 63 n.2 (Cowin, J., dissenting). It is up to the motion judge to determine the weight and credibility of the oral testimony given at the hearing. See *Commonwealth* v. *Eckert*, 431 Mass. 591, 592-593 (2000), citing *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990). "Even if the statements had been conflicting, it would have been for the fact finder to determine which version to believe, absent an affirmative election between the versions by each witness." *Anthony's Pier Four, Inc.* v. *Crandall Dry Dock Eng'rs, Inc.*, 396 Mass. 818, 827 (1986). See *Commonwealth* v. *Geisler*, 14 Mass. App. Ct. 268, 273-274 n.6 (1982). Moreover, even if the officers did read Gravina her rights and inform her of the search warrant before they knew her identity, they should not be penalized for doing so.

facts, the Court asserted that the detention of an occupant is only an "incremental intrusion" on his or her liberty when police have a valid search warrant. *Id.* at 703. Further, the very existence of the warrant objectively justifies the detention, because a neutral magistrate has determined there is "probable cause to believe that someone in the home is committing a crime." *Id.* Thus, the Court reasoned that the occupant's connection to the home gives police an "easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Id.* at 704. The Court concluded that it is constitutionally reasonable to require persons to remain on the premises while police execute a valid warrant to search their home. *Id.* at 705.

Here, the defendant and Gravina had walked fifty to seventy feet down the driveway when the police stopped them, "as soon as practicable" after they had left the apartment. *United States v. Cochran*, 939 F.2d 337, 339 (6th Cir. 1991), cert. denied, 502 U.S. 1093 (1992). Contrast *United States v. Boyd*, 696 F.2d 63, 65 n.2 (8th Cir. 1982), cert. denied, 460 U.S. 1093 (1983) (holding *Summers* unavailing when police stopped resident several blocks from his home to effect search warrant). The detention of Gravina just outside her apartment comported with the requirements of the Fourth Amendment.[12] See *Michigan v. Summers, supra* at 705. There was no error.

[12]Although the judge did not pinpoint the moment at which the encounter turned into a seizure of Gravina for constitutional purposes, see, e.g., *Commonwealth v. Torres*, 424 Mass. 153, 163 n.8 (1997), we find the reasoning of *People v. Taylor*, 41 P.3d 681, 687-689 (Colo. 2002), persuasive in upholding the reasonableness of the police conduct in first approaching her.

In the *Taylor* case, police spotted a suspect for whom they had an arrest warrant riding in a car which the defendant was driving. *Id.* at 683. They ordered the defendant, who had not committed any traffic violations and was not suspected of committing any other crime, to pull over so they could arrest the passenger. *Id.* at 683-684. After placing her under arrest, the police asked for the defendant's driver's license, and had him get out of the car so they could search it (incident to the arrest of the passenger). The search turned up a small black case containing drug paraphernalia and cocaine, which the defendant acknowledged was his. *Id.* at 684. Police then arrested him as well.

The *Taylor* court determined that, while ordering the defendant to pull over so police could arrest the passenger constituted a seizure, the "traditional method of ascertaining the reasonableness of Fourth Amendment seizures — analyzing whether officers had probable cause justifying an arrest of an

b. *Article 14.* The Commonwealth contends the judge based his ruling on clearly erroneous findings of fact, and erred as a matter of law when he ruled that the detention of Gravina outside the apartment building violated art. 14 of the Massachusetts Declaration of Rights. It argues that the legitimate law enforcement interests that justified the stop upheld in *Michigan* v. *Summers, supra,* do not conflict with art. 14, and moreover, that art. 14 was not offended here because the police acted reasonably in obtaining the search warrant and subsequently detaining Gravina.[13]

individual or reasonable suspicion justifying an investigatory stop of an individual — is too rigid a framework" to resolve the question. *Id.* at 687. The facts, it decided, presented one of those "rare situations" referred to in *Delaware* v. *Prouse,* 440 U.S. 648, 654-655 (1979), which recognized the existence of encounters "in which the balance of [Fourth Amendment] interests precludes insistence upon 'some quantum of individualized suspicion,' " i.e., reasonable suspicion or probable cause to believe an individual has engaged in criminal activity. See *People* v. *Taylor, supra* at 688. In such situations, "other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.' " *Delaware* v. *Prouse, supra* at 655, quoting *Camara* v. *Municipal Court,* 387 U.S. 523, 532 (1967). The *Taylor* court held that probable cause to arrest the passenger, coupled with the necessity of stopping the car to effect the arrest, sufficiently safeguarded the driver's liberty interest from the unfettered discretion of police officers in the field. See *People* v. *Taylor, supra* at 688, citing *Delaware* v. *Prouse, supra* at 655. Balancing the public interest against the individual's, the court concluded that the seizure was reasonable. *People* v. *Taylor, supra* at 688. See 4 W.R. LaFave, Search and Seizure § 9.2, at 7 (Supp. 2004) (noting that *People* v. *Taylor, supra,* illustrates situation where person may be temporarily seized even absent reasonable suspicion).

Here, as in the *Taylor* case, the initial encounter with Gravina was neither an arrest nor an investigatory stop. See *id.* at 687. The police explained to both her and the defendant why the defendant was being detained (and therefore unable to continue in Gravina's company), an intrusion on Gravina that was at least as minimal as ordering a driver to pull over. Cf. *People* v. *Taylor, supra.* The public interest in detaining the defendant, whom the police had probable cause to arrest, warranted the incidental intrusion on Gravina, who happened to be with him. See *People* v. *Jackson,* 39 P.3d 1174, 1185 (Colo. 2002). Events unfolded rapidly thereafter and Gravina blurted out that the apartment was hers, providing police with a basis to bring her back while they searched the premises. See *Michigan* v. *Summers, supra* at 705. The police acted reasonably in the circumstances, and the defendant does not suggest that they could have done anything differently.

[13]We believe that the case of *Commonwealth* v. *Pellier,* 362 Mass. 621 (1972), on which Justice Ireland's dissent partly relies, is distinguishable from

We agree with the Commonwealth that the judge premised his ruling on clearly erroneous findings of fact. First, the judge found that the task force "had reason to believe that [the defendant] and Gravina would be present" at the apartment. Although the affidavit in support of the application for the search warrant states that a confidential informant had told investigators that the defendant lived at the apartment with his girl friend,[14] the affidavit did not identify or describe Gravina. There was also no testimony at the hearing to support the judge's finding. On the contrary, Balcom testified only that "[w]e didn't even know if they were home." Second, the judge found that "[t]he police planned to watch [the apartment building] for the departure of [the defendant], to detain him outside of the premises, and to bring him back to the premises for the purpose of gaining entry and having him present while the Task Force executed the warrant." Again, the evidence fails to support this finding. Balcom testified only that part of the purpose of setting up surveillance was "to find out if anyone was there." Furthermore, the police had a no-knock warrant; they did not need the defendant (or Gravina, for that matter) to let them into the apartment.

We must now inquire whether the detention of Gravina was permissible under art. 14. In certain circumstances we have concluded that art. 14 provides greater protection against searches and seizures than the Fourth Amendment. See *Commonwealth* v. *Rodriguez*, 430 Mass. 577, 582, 584 n.7 (2000). A warrantless search or seizure violates art. 14 only if it is unreasonable. See *Landry* v. *Attorney Gen.*, 429 Mass. 336, 348

the instant case. See *post* at 59-60 (Ireland, J., dissenting). The defendants in the *Pellier* case were arrested outside their apartment building after identifying themselves as occupants of that address. See *id.* at 624. Here, Gravina was not arrested but merely detained after blurting out that it was her apartment. Also, the *Pellier* briefs make no art. 14 argument in that case, and in any event, the court upheld the search of the defendant as incident to a lawful arrest. *Id.* at 626. Finally, we point out that *Michigan* v. *Summers, supra,* was decided nine years after *Commonwealth* v. *Pellier, supra.*

[14]During the hearing on the motion to suppress, the judge had sustained objections to questions concerning whether an informant had told Balcom "whether anybody else lived there with him." Nevertheless, the judge found that the informant "stated that [the defendant] was residing at Apt. 5 with his girlfriend."

(1999). There is no ready test for reasonableness except by balancing the need to search or seize against the invasion that the search or seizure entails. See *id.*, quoting *Commonwealth* v. *Shields,* 402 Mass. 162, 164 (1988). The reviewing court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Commonwealth* v. *Thomas,* 429 Mass. 403, 407 (1999), quoting *Bell* v. *Wolfish,* 441 U.S. 520, 559 (1979). See K.B. Smith, Criminal Practice and Procedure § 153 (2d ed. 1983 & Supp. 2003).

The Commonwealth asserts that the police had legitimate interests in detaining Gravina outside the building. The police had information that the defendant lived with his girl friend, and they saw him leave the apartment with an unknown woman. It was Gravina who, on learning of the search warrant, voluntarily blurted out that it was her apartment, without any prior questioning by police. At that point, the Commonwealth claims, the State had an interest in preventing her from fleeing in the event that they found incriminating evidence inside; in minimizing the risk of harm to officers (who had probable cause to believe that the defendant owned a firearm); and in completing the search in an orderly fashion, with minimal delay and damage. See *Michigan* v. *Summers, supra* at 702-703.

The intrusiveness of the detention, by the same token, was minimal. The defendant and Gravina were intercepted shortly after they walked out the door, when they were one-half to three-quarters of the way down the driveway. At that time the police admittedly had no information that Gravina had committed a crime, and were not concerned that she was armed. She was neither pat frisked nor handcuffed. Balcom testified that most of the conversation during the initial encounter that took place among the defendant, Gravina, and the three police officers who first approached them, was a "collective conversation." After volunteering that the apartment was hers, and expressing concern about the police entry, Gravina agreed to accompany the group back to the apartment so the officers could execute the warrant.

Under our art. 14 jurisprudence, the police needed reasonable suspicion that Gravina was committing, had committed, or was

about to commit a crime, to justify detaining her and bringing her back to the apartment. See, e.g., *Commonwealth* v. *Eckert,* 431 Mass. 591, 599 (2000). See also J.A. Grasso & C.M. McEvoy, Suppression Matters Under Massachusetts Law § 4-2(e) (2003). Gravina's spontaneous acknowledgment that it was her apartment provides such a basis, because a neutral, detached magistrate had already determined there was probable cause to believe narcotics were being sold there.[15] See *Michigan* v. *Summers, supra* at 703. "The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant" while the police search the home pursuant to a valid warrant. *Id.* at 703-704.

Although Gravina was not inside the apartment but some fifty to seventy feet away when police detained her, her detention at that point was incremental and barely, if at all, more intrusive than if it had originated inside. See *Michigan* v. *Summers, supra* at 702 n.16. Moreover, it is reasonable to "assume that most citizens — unless they intend flight to avoid arrest — would elect to remain in order to observe the search of their possessions." *Id.* at 701. We think that for purposes of art. 14, like the Fourth Amendment, "it is constitutionally reasonable to require [a] citizen to remain while officers of the law execute a valid warrant to search his home." *Id.* at 705.

The motion judge faulted the police for failing to request and obtain authorization from the magistrate "to seize [the defendant] and any other occupant of Apt. 5" outside the premises, despite their "anticipation" that the defendant would be present. His reliance on *Commonwealth* v. *Scalise,* 387 Mass. 413, 420-423 (1982), however, is misplaced, because that opinion imposes no such requirement on police. Moreover, there is no challenge to the validity of the no-knock warrant in this case. The warrant application did seek permission to search both the defendant and "any person present" inside the apart-

---

[15]We do not, as Justice Ireland suggests, hold that merely being in the company of the defendant constituted "suspicious conduct" that justified the detention of Gravina. See *post* at 61 (Ireland, J., dissenting).

ment and the warrant commanded police to do so.[16] See *Commonwealth* v. *Smith*, 370 Mass. 335, 348, cert. denied, 429 U.S. 944 (1976) (explaining in what circumstances an "any person present" clause authorizes a valid search). On their arrival, the police did what they were supposed to do: "[M]ake a threshold reappraisal of the actual threat of the destruction of evidence" to determine whether an unannounced entry was necessary. See *Commonwealth* v. *Scalise, supra* at 421. While they were doing so, they unexpectedly encountered Gravina and the defendant in the driveway.[17] For the purposes of our analysis, it is unimportant how we label the encounter. See 4 W.R. LaFave, Search and Seizure § 9.1(c), at 10 (3d ed. 1996) ("It is the reasonableness of the officer's conduct, not what the state chooses to call it, which is in issue"). We conclude that the police acted reasonably under the circumstances, and therefore their conduct did not offend either the Fourth Amendment or art. 14.[18]

We vacate the order of suppression and remand the case to the Superior Court for entry of an order denying the motion to suppress.

*So ordered.*

IRELAND, J. (dissenting). Because the warrant in this case specifically authorized the search of only the defendant (named as an "occupant") and "any person present," I would affirm the allowance of the defendant's motion to suppress evidence seized from Meredith Gravina, for four reasons: (1) the warrant did not specifically authorize the seizure of persons outside of the apartment; (2) I conclude that art. 14 of the Massachusetts Declara-

---

[16]While Justice Ireland correctly points out, *post* at 60 (Ireland, J., dissenting), that the "any person present" clause of a search warrant did not support the arrest of the defendant in *Commonwealth* v. *Pellier*, 362 Mass. 621, 625 (1972), our holding here in no way relies on this clause of the warrant.

[17]The record, however, does not support the judge's finding or the assertion in the dissent that three minutes elapsed before police approached the pair in the driveway. See *post* at 59 (Ireland, J., dissenting).

[18]We leave for another day the question whether art. 14 may provide greater protection than the Fourth Amendment where an occupant is detained at a significant distance from the premises to be searched, rather than merely fifty to seventy feet away.

tion of Rights grants individuals more protection than does the Fourth Amendment to the United States Constitution; (3) the police illegally detained Gravina when they first approached her and the defendant; and (4) even if *Michigan* v. *Summers*, 452 U.S. 692 (1981), did apply in some circumstances, it would not apply in the circumstances of this case.

The motion judge found that three minutes after police officers saw the defendant and an unidentified female (Gravina) leave the apartment that was the subject of the search warrant, three armed police officers approached the pair in a parking lot.[1] It is uncontroverted that the parking lot was some fifty to seventy feet from the apartment. The motion judge further found that, at that moment, Gravina was unknown to the officers; she was not identified on the warrant as an occupant of the apartment. The police immediately stated that they had a search warrant for the apartment. Gravina blurted out that it was her apartment. Police officers displayed the search warrant. State and Federal law enforcement officers, by now numbering five, gave the defendant and Gravina the Miranda warnings, handcuffed the defendant, and led the two back to the apartment. The motion judge found, and I agree, that Gravina was seized outside the apartment for purposes of the Fourth Amendment and art. 14.

Article 14 states that a search warrant is not proper unless it has a "special designation of the persons or objects of search, arrest, or seizure."[2] Our cases concerning search warrants have upheld the particularity requirement, and I see no reason to depart from their holdings. *Commonwealth* v. *Pellier*, 362 Mass. 621 (1972), addressed facts similar to the facts of this case: The defendant was an occupant of an apartment that was the subject of a search warrant, which, like the warrant in this case, authorized both the search of another man, referred to by the name Fernando, as well as "any persons present" who might have contraband in their possession (first warrant). On the night

---

[1]Contrary to the court's assertion, *ante* at 58 n.17, the record does support, through the testimony of Detective Balcolm, the motion judge's finding that three minutes passed before the police officers approached the defendant and Gravina. The finding, therefore, cannot be clearly erroneous.

[2]See also G. L. c. 275, §§ 1, 2.

the police executed the first warrant, Pellier was stopped when he and Fernando pulled up in front of the building that was the subject of the first warrant in a vehicle with a registration plate that matched the one described in a second search warrant (second warrant) the police also were executing. The police officers went up to the car and asked Pellier and Fernando their names and addresses. The police officers learned that Pellier was an occupant of the apartment that was the subject of the first warrant when Pellier identified himself and stated his address. Police officers searched both men and found a bag of heroin on Pellier. In the meantime, police officers also searched the apartment pursuant to the first warrant and found heroin and other contraband.

On appeal, the court stated a search of Pellier pursuant to the first warrant was not proper and, therefore, the heroin found on Pellier's person could only be the basis for convicting him if it was properly seized pursuant to the second warrant. The court also focused on the "any person present" language as an improper basis to introduce the heroin found on Pellier's person. *Id.* at 625-626 & n.3 (" 'any person or persons present' . . . lacks specificity and is of dubious meaning").

In *Commonwealth* v. *Smith*, 370 Mass. 335, cert. denied, 429 U.S. 944 (1976), the court departed from *Pellier* when it held that the "any person present" language contained in a search warrant was constitutional. *Id.* at 339-342. However, the court also said that the "law requires a particular description of the persons to be searched pursuant to a warrant" and "the 'any person present' clause" does not relax the particularity requirement as it applies to all identifiable persons *known* to be on the premises" (emphasis added). *Id.* at 339, 344. The court expressed concern about innocents being swept up in the search and required that applications for search warrants indicate whether any person unconnected with the illegal activity had been seen at the premises. *Id.* at 345. See *Commonwealth* v. *Rutkowski*, 406 Mass. 673, 675 (1990) (items to be seized must be described with sufficient particularity pursuant to art. 14).

In this case, the officers knew that the defendant lived with his girl friend, yet she was not named or identified on the war-

rant as an occupant subject to search.[3] I would conclude from this that the police did not have probable cause to believe the girl friend was involved in criminal activity and it was entirely proper to omit her from the warrant, in light of the caution expressed in *Commonwealth* v. *Smith, supra.* Moreover, it is foreseeable that, by happenstance, an occupant of an apartment could be leaving her residence at the same time police officers execute a search warrant, particularly in the circumstances of this case. Here, officers had authority to search at night without having to knock, but they went to the apartment at approximately 4 P.M. At that time of day, it is foreseeable that occupants would be leaving (or arriving at) their residences. The officers, on showing probable cause, should have asked the magistrate to issue a warrant covering, within explicit limits as to time and distance, those individuals the police observed leaving the apartment at the time the warrant would be executed.

Based on our case law and the plain language of art. 14, I conclude that art. 14 confers broader protection on individuals than does the Fourth Amendment.[4]

To support its holding, the court relies both on the fact that Gravina blurted out that she lived in the apartment and on *Michigan* v. *Summers*, 452 U.S. 692 (1981). I do not agree with the court that, because Gravina was with the defendant, she demonstrated the requisite *"suspicious conduct* [to give] the officer[s] reason to suspect that [she had] committed, [was] committing, or [was] about to commit a crime." *Commonwealth* v. *Grandison*, 433 Mass. 135, 139 (2001), quoting *Commonwealth*

[3]The court notes, *ante* at 55 n.14, that, despite sustaining objections to questions whether an informant told Detective Balcom that the defendant's girl friend lived in the apartment, the judge found that she did live there. The statement that the defendant lived with his girl friend was in the affidavit supporting the warrant. At a motion to suppress hearing, the judge can properly consider hearsay in an affidavit. See, e.g., *Commonwealth* v. *Honneus*, 390 Mass. 136, 139 (1983).

[4]In other contexts, this court has held that art. 14 of the Massachusetts Declaration of Rights confers rights on individuals that are not granted by the Fourth Amendment to the United States Constitution. See *Commonwealth* v. *Upton*, 394 Mass. 363, 373 (1985) ("art. 14 provides more substantive protection to criminal defendants than does the Fourth Amendment in the determination of probable cause"). See also *Commonwealth* v. *Rodriguez*, 430 Mass. 577, 584, 585 & n.7 (2000), and cases cited (art. 14 prohibits roadblocks to search for contraband such as drugs).

v. *Silva*, 366 Mass. 402, 405 (1974). See *Commonwealth* v. *Rodriguez*, 430 Mass. 577, 579 (2000). I believe that Gravina was illegally seized at the moment the first three armed police officers approached her and the defendant in the parking lot, and therefore the exclusionary rule applies to her statement that she lived in the apartment, as well as to the drugs found in her purse. See *Commonwealth* v. *Stoute*, 422 Mass. 782, 783 (1996) (person seized under art. 14 once police officer has initiated pursuit of person with obvious intent of requiring him to submit to questioning).[5] See also *Commonwealth* v. *Balicki*, 436 Mass. 1, 15 (2002) (evidence excluded because fruit of unlawful actions of police officers).

Furthermore, even assuming that the holding in *Michigan* v. *Summers, supra*, did not violate art. 14, it would not apply to this case, because it can be distinguished on the facts. In *Summers*, as police were about to execute a search warrant, "they encountered respondent *descending the front steps*" (emphasis added). *Id.* at 693. In this case, however, the police set up surveillance to determine whether anyone was home and, therefore, had not approached the apartment to execute the warrant. They saw the defendant and Gravina leave the apartment from their point of surveillance. As the motion judge found, three minutes elapsed before police officers approached the pair. It is uncontroverted that, by then, the defendant and Gravina were walking across a parking lot, some fifty to seventy feet from the apartment. Thus, unlike the police in the *Summers* case, the police in this case were not executing a search warrant and did not "encounter[] [Gravina or the defendant] descending the front steps." *Id.*

For the reasons stated above, I respectfully dissent.

COWIN, J. (dissenting, with whom Marshall, C.J., joins). Had Meredith Gravina been inside her apartment at the time the search was executed, the search warrant in this case, which authorized the search of apartment no. 5 at 521 Main Street,

[5]Assuming, arguendo, that the police were justified in stopping the defendant, had they asked Gravina to step aside as they approached and apprehended the defendant, and only then did Gravina blurt out that she lived there, it would be, in my opinion, different.

Hyannis, and of "any person present," would have justified detention and search of her person. See *Commonwealth* v. *Smith*, 370 Mass. 335, 344-346, cert. denied, 429 U.S. 944 (1976). However, at issue in this case is Gravina's status *outside* the apartment. The police detained Gravina in an alley[1] next to a restaurant after she had left her apartment, stopped "for a short . . . time" on the front steps, walked through the apartment building's parking area, and then proceeded another fifty to seventy feet down that alley toward Main Street in Hyannis. This detention occurred at least two minutes after Gravina left her apartment. Today the court concludes, citing to *Michigan* v. *Summers*, 452 U.S. 692 (1981) (*Summers*), that Gravina's detention, because it occurred prior to the police executing a search warrant inside her apartment, did not violate the Fourth Amendment to the United States Constitution. The court further determines that this detention did not violate art. 14 of the Massachusetts Declaration of Rights. I disagree. I am not persuaded by the reasoning of *Michigan* v. *Summers*, *supra*, and would not rely on that case to answer the defendant's challenge under the Massachusetts Constitution. As to his Federal claim, because the facts in this case differ from those in *Summers*, even if this court adopted the exception to the warrant requirement announced in *Summers*, the seizure in this case would still be invalid. I respectfully dissent.[2]

In *Summers*, the United States Supreme Court created an

---

[1]It is difficult to envision the alley. According to Detective Balcom's testimony at the motion hearing, 521 Main Street is a multi-unit apartment building located off Main Street behind a restaurant. Beside the restaurant is what Balcom alternately described as an "alley" or "driveway," about "[one hundred] feet long [which] opens up into a parking area in front of [521 Main Street]." Balcom stated that it was "reasonable to assume that" this parking lot was used both by the restaurant and by the apartment building residents.

[2]Had Gravina consented to the seizure by voluntarily accompanying the police back to her apartment, there would be no doubt the motion to suppress should have been denied. The Commonwealth, however, has not relied on consent at any point during these proceedings. The question for decision was raised by the defendant, when he claimed he was the victim of an "unlawful search and seizure"; by necessary implication the defendant was alleging that Gravina did not consent. The Commonwealth "bears the burden of proving that the consent was "in fact, freely and voluntarily given," and was "more than acquiescence to a claim of lawful authority." *Commonwealth* v. *Krisco Corp.*, 421 Mass. 37, 46 (1995), quoting *Bumper* v. *North Carolina*, 391 U.S. 543, 548-549 (1968). This burden was not met. The court intimates that

exception to the warrant requirement under the Fourth Amendment, and concluded that the temporary detention of occupants of premises without an arrest warrant, while a search warrant is being executed, will in some cases pass constitutional muster. *Id.* at 704-706. See *Illinois* v. *McArthur,* 531 U.S. 326, 331 (2001). This exception was premised on the Court's assessment that some seizures are "so much less severe" than traditional arrests that "the opposing interests" of law enforcement can outweigh the privacy interests implicated by the seizure. *Michigan* v. *Summers, supra* at 697-698, quoting *Dunaway* v. *New York,* 442 U.S. 200, 209 (1979). In *Summers,* the Supreme Court held that the additional intrusion caused by requesting a departing occupant to assist the police in gaining access to the premises and detaining him on the front steps of his house, rather than inside the premises, was outweighed by the legitimate interests of (1) minimizing the possibility of harm to the police officers, (2) preventing flight, and (3) facilitating orderly completion of the search. *Id.* at 702-703.

Because art. 14 may provide greater protection against governmental intrusion than does the Fourth Amendment, see *Commonwealth* v. *Rodriguez,* 430 Mass. 577, 584-585 n.7 (2000), this court can and should reject *Summers,* which posits that a little bit of illegal seizure is acceptable if the personal privacy which that seizure threatens is outweighed by law enforcement interests. *Id.* at 697-698.

*Summers,* of course, was an exception to the requirement that searches and seizures by police must be based on probable cause, purportedly following the reasoning of *Terry* v. *Ohio,* 392 U.S. 1 (1968) (*Terry*) (police officers who suspect criminal activity may stop suspect on less than probable cause), and *United States* v. *Brignoni-Ponce,* 422 U.S. 873 (1975) (*Brignoni-Ponce*) (border patrol agents justified in making brief vehicle stops based on less than probable cause). See *Michigan* v. *Summers, supra* at 698-699. In those cases, the Supreme Court allowed narrow exceptions to the Fourth Amendment's probable

Gravina may have accompanied the police voluntarily in order to care for a puppy, but no such finding was made by the judge. Further, merely admitting that it was her apartment did not constitute consent. Absent a showing of consent by the Commonwealth and any finding of consent below, we must assume Gravina did not consent to return to the apartment.

cause requirement due to the particular law enforcement interests involved. *Id.* at 707 (Stewart, J., dissenting). In *Terry*, the particular interest that justified the stop was the need for police officers to be able to conduct some sort of investigation when they have less than probable cause but more than a hunch (i.e., they can point to "specific and articulable facts") that criminal activity is in progress. *Terry* v. *Ohio, supra* at 21. In *Brignoni-Ponce*, the interest was the difficult task of preventing illegal entry of aliens at the Mexican border. *United States* v. *Brignoni-Ponce, supra* at 878-882. In both cases, the Court stated that the interests at stake exceeded or were independent of the government's ordinary interests in investigating crime and apprehending wrongdoers. See *United States* v. *Brignoni-Ponce, supra* at 883; *Terry* v. *Ohio, supra* at 23. See also *Michigan* v. *Summers, supra* at 709 (Stewart, J., dissenting). Because of the unusual and important nature of those interests, the Court abandoned the " 'long-prevailing standards' of probable cause" and instead employed a balancing test, the result of which was to allow minimal intrusions into personal privacy where the privacy implications were outweighed by the unique law enforcement interests present in those cases. *Michigan* v. *Summers, supra* at 708-712 (Stewart, J., dissenting), quoting *Dunaway* v. *New York, supra* at 208.

As the dissent in *Summers* elucidated, however, it is an inappropriate leap in logic to suggest that *Terry* and *Brignoni-Ponce* endorse the notion that "courts may approve a wide variety of seizures not based on probable cause, so long as the courts find, after balancing the law enforcement purposes of the police conduct against the severity of their intrusion, that the seizure appears 'reasonable.' " *Michigan* v. *Summers, supra* at 706 (Stewart, J., dissenting). The law enforcement interests invoked in *Summers* (minimizing the possibility of harm to police who do not have articulable suspicion that a suspect is armed and dangerous, preventing flight, and facilitating an orderly search) may be laudable, but they are not sufficient to justify conducting this exceptional balancing test. *Id.* (Stewart, J., dissenting). Instead, when ordinary law enforcement interests are at stake, the "Fourth Amendment itself has already performed the

constitutional balance between police objectives and personal privacy." *Id.* (Stewart, J., dissenting). If the traditional balancing already performed by the Fourth Amendment were to be abandoned in considering these ordinary law enforcement interests, and the reasoning of *Summers* were to be followed to its logical conclusion, privacy concerns would have to be weighed against law enforcement interests by the courts in every case, and by the police in every encounter with a citizen.

The *Summers* dissent also questioned, correctly in my estimation, whether the asserted justifications for the detention reflected legitimate police interests in the circumstances of that case. There was no suggestion there that the defendant posed a threat to police officers or anyone else. *Summers, supra* at 709 n.1 (Stewart, J., dissenting). Indeed, he was leaving the premises the police were about to search. As to the government's asserted interest in preventing flight, Justice Stewart stated: "If the police, acting without probable cause, can seize a person to make him available for arrest in case probable cause is later developed to arrest him, the requirement of probable cause for arrest has been turned upside down." *Id.* at 709 (Stewart, J., dissenting).[3] Finally, if a detention without probable cause is permissible in order to "facilitate" a search warrant that is not accompanied by an arrest warrant, "the fundamental principle that the scope of a search and seizure can be justified only by the scope of the underlying warrant has suffered serious damage." *Id.* (Stewart, J., dissenting). Moreover, as the dissent pointed out, a superficial reading of the *Summers* opinion "may suggest a minor intrusion of brief duration." *Id.* at 711. (Stewart, J., dissenting). However, "a detention 'while a proper search is being conducted' can mean a detention of several hours." *Id.* (Stewart, J., dissenting), quoting *Michigan v. Summers, supra* at

---

[3]Although "disfavored," brief seizures on less than probable cause are permissible to conduct "showup" identifications "in the immediate aftermath of a crime." *Commonwealth* v. *Johnson,* 420 Mass. 458, 461 (1995). "Such identification procedures are justified by the need for prompt criminal investigation while the victim's 'recollection or mental image of the offender is still fresh . . . .' " *Commonwealth* v. *Leonardi,* 413 Mass. 757, 761 (1992), quoting *Commonwealth* v. *Barnett,* 371 Mass. 87, 92 (1976), cert. denied, 429 U.S. 1049 (1977). The facts of this case present no such urgency.

705. Thus, a person may be made a prisoner in his own home for a long period of time.[4]

Even though this court has accepted the reasoning in *Summers*, the facts of the present case cannot be shoe-horned into that narrow exception, because here the intrusion into personal privacy is greater and is not outweighed by any legitimate police interests. The character of the intrusion here was greater than that in *Summers*. It did not occur on the doorstep of a private home, as in that case, but in an alley adjacent to a parking area located between a restaurant and the entrance to a multi-unit apartment building, and at least fifty to seventy feet from that entrance. While *Summers* did not specify geographic distances by which to measure the intrusiveness of a detention, other courts have recognized that the level of intrusiveness of a *Summers* detention increases when the suspect is stopped in a place that is itself not the subject of the search warrant. See, e.g., *United States* v. *Sherrill*, 27 F.3d 344, 346 (8th Cir.), cert. denied, 513 U.S. 1048 (1994) (refusing to extend *Summers* to a detention occurring on the street, one block away from premises to be searched, because the distance from the premises made the intrusiveness "much greater"). Accord *United States* v. *Boyd*, 696 F.2d 63 (8th Cir. 1982), cert. denied, 460 U.S. 1093 (1983). See also *Leveto* v. *Lapina*, 258 F.3d 156, 169 (3d Cir. 2001) (detention of suspect in parking lot of business for which search warrant had been issued increased the level of intrusiveness); *United States* v. *Edwards*, 103 F.3d 90, 93-94 (10th Cir. 1996) (streetside stop of defendant three blocks from premises did not comport with *Summers*); *United States* v. *Taylor*, 716 F.2d 701, 707 (9th Cir. 1983) (distinguishing *Summers* because suspect was detained while attempting to drive away from the premises, and not "in or adjoining the place being searched"). Cf. *United States* v. *Cochran*, 939 F.2d 337, 339 (6th Cir. 1991), cert. denied, 502 U.S. 1093 (1992) (seizure and return of resident "a short distance from his residence" valid under *Summers*).

The increased intrusiveness at issue here is not outweighed by any of the legitimate law enforcement interests enumerated

---

[4]The record in *Summers* did not make clear the duration of the search and the defendant's detention. *Michigan* v. *Summers*, 452 U.S. 692, 711 n.3 (1981) (Stewart, J., dissenting).

in *Summers*. First, the increased intrusiveness does not assist in protecting the safety of law enforcement officers. Detective Balcom testified that the police did not consider Gravina a threat to their safety. Indeed, when the police accosted her she was neither placed in handcuffs nor frisked. In addition, a person who is at some distance from and walking away from the premises to be searched does not pose any risk to officers, unlike those inside or just on the doorstep. See, e.g., *United States* v. *Edwards, supra* at 94 (suspect who has left area and is unaware of search warrant poses no threat to officers); *United States* v. *Hogan*, 25 F.3d 690, 693 (8th Cir. 1994) (where police seized defendant in his car miles from the premises subject to the warrant, no risk of harm to officers conducting search). Cf. *United States* v. *Cochran, supra* at 339 & n.3 (*Summers* detention on street valid because police needed suspect's assistance to handle guard dog located on premises). Second, preventing Gravina's flight was not a legitimate interest here.[5] If the illegal stop and detention had not occurred, Gravina would have proceeded to Main Street and been unaware of any reason to flee. See, e.g., *United States* v. *Edwards, supra* at 93-94; *United States* v. *Hogan, supra* at 693. Third, at the time they apprehended her, the police had no reason to believe that Gravina had a key to the premises. In any event, Gravina's possession of such a key is not in itself enough to conclude that her presence was necessary for an orderly completion of the search. *United States* v. *Edwards, supra* at 92-94 (obtaining keys from suspect did not convert illegal seizure into valid *Summers* detention). Surely, in most cases, the police do not need the assistance of the occupant to gain access to the premises without major

---

[5]A seizure based on less than probable cause, made with the aim of preventing flight in case evidence is found that generates probable cause for an arrest, exceeds the scope of a *Terry* stop. *Commonwealth* v. *Borges*, 395 Mass. 788, 790-791 (1985) (where police had reasonable suspicion for *Terry* stop, but not probable cause for an arrest, ordering that the defendant remove his shoes to prevent flight was an illegal seizure). See *Commonwealth* v. *Rodriguez*, 430 Mass. 577, 583-585 (2000) (roadblock does not comport with art. 14 when it is nothing more than a "generalized search for evidence of criminal activity conducted without probable cause or reasonable suspicion"); *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 663 (1999) (police should not prolong routine traffic stops "in the hope that, sooner or later, the stop might yield up some evidence of an arrestable crime").

damage. Further, the court assumes that those who may be charged with a crime desire to remain on the premises with police officers and protect their property. Neither common sense nor the facts of this case support such an assumption. Finally, there is no reason to believe that the presence of a suspect facilitates the orderly progression of a search.

There is an even more important distinction between *Summers* and the present case. The objective justification for the detention in *Summers* was to a great extent premised on the connection of the defendant to the premises in question. *Michigan* v. *Summers*, *supra* at 703-704. As the *Summers* Court stated, because a "judicial officer has determined . . . someone in the home is committing a crime . . . [t]he connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." *Id.* The court today points to this connection as providing the requisite "articulable facts" under the Fourth Amendment and "reasonableness" under art. 14 to justify the detention.[6] In fact there was no such connection between Gravina and the premises. The

[6]The court cites *People* v. *Taylor*, 41 P.3d 681 (Colo. 2002) (*Taylor*), in support of its argument that the initial encounter with Gravina was a reasonable, short, and incidental intrusion on her privacy. *Ante* at 53 n.12. However short this initial detention may have been, it was crucial, as it gave Gravina the opportunity to provide the police with the information that the Commonwealth claims provided reasonable suspicion to detain her, i.e., that the apartment was hers. *Taylor* is a weak reed. The balancing test invoked in *Taylor*, *supra* at 687, to justify the seizure of the occupant of an automobile was based in part on *Maryland* v. *Wilson*, 519 U.S. 408 (1997), and *Pennsylvania* v. *Mimms*, 434 U.S. 106 (1977), cases that have been rejected by this court as not comporting with art. 14 of the Massachusetts Declaration of Rights. See *Commonwealth* v. *Gonsalves*, 432 Mass. 613, 614 (2000). But even if we followed the Colorado court in interpreting the Massachusetts Constitution, *Taylor* is distinguishable from the present case. In *Taylor*, the police were entitled to seize the defendant driver by pulling over his vehicle because they had an arrest warrant for the defendant's passenger. Indeed, there was no practical way to arrest the passenger of a moving vehicle without also briefly detaining the driver. The police were also entitled to order the defendant driver out of his vehicle, so that they could conduct a search of the passenger compartment incident to the passenger's arrest. *Id.* at 684. But following this activity, which was necessary to effectuate the arrest of the passenger, "the officers no longer had any justification to detain [the defendant]," *People* v. *Taylor*, *supra* at 688, who was not reasonably suspected of any criminal activity. No similar exigencies existed in this case, where the seizure of

Commonwealth *v.* Catanzaro.

court states that justification for her detention, i.e., her "connection" to the premises, was provided by her status as an "occupant" of the premises for which the warrant was issued. This status, the argument goes, was established by her statement, "That's my apartment," prior to being shown the warrant or read her Miranda rights, in other words, before she was detained.[7]

In this case, however, the record compels the finding that the detention of Gravina occurred prior to the police learning of her status as an "occupant," in other words, *prior to* the asserted objective justification for that detention. Regarding the initial encounter, the judge found that four distinct elements occurred in the following order: (1) Gravina and the defendant were informed by the police of the existence of the warrant; (2) Gravina stated that the apartment to be searched was hers; (3) Gravina and the defendant were shown the warrant and then; (4) Gravina and the defendant were Mirandized. However, the only officers who testified both testified that Gravina was read her Miranda rights *before* her statement (Detective Balcom on direct and redirect examination, and Detective Lieutenant Allen during direct and cross-examination). In argument during the motion hearing, the district attorney also stated that Gravina made her statement after being shown the warrant and advised of her Miranda rights, and the Commonwealth's own appellate brief recites the facts in this order as well. Only once on the record (during the cross-examination of Detective Balcom), does it appear that Gravina made her statement before being Mirandized. Thus, the record does not support the judge's finding that Gravina made her statement prior to being *shown* the warrant. To the contrary, the judge's finding is clearly erroneous. At the time Gravina was detained, the police were not aware of

---

Gravina, whom the police did not suspect of any criminal activity and who was merely walking down an alley with the defendant, was not necessary to the implementation of the search warrant, or to the arrest of the defendant. Thus, *Taylor* does not provide support for the detention of Gravina.

[7]The court's definition of "occupant" encompasses those who reside in the premises, the people who live there as opposed to mere visitors. *Ante* at 51. Some courts have held otherwise, i.e., that an "occupant" also includes visitors for purposes of a *Summers* detention. For various definitions of "occupant" used by different jurisdictions in interpreting *Summers*, see *Stanford v. State*, 353 Md. App. 527, 536-538 (1999).

articulable facts that provided the requisite connection between Gravina and the premises, and her detention therefore was not reasonable.[8]

Even if the judge's finding was not erroneous, and even if Gravina had admitted to living in the apartment prior to her detention, there was still no valid justification for that detention. Absent the suggestions in *Summers*, which might favor the validity of Gravina's detention, the only arguably legitimate rationale for the seizure can be found in *Terry* v. *Ohio, supra.* Under *Terry*, an officer has the right to "make a threshold inquiry where suspicious conduct gives the officer reason to suspect that a person has committed, is committing, or is about to commit a crime." *Commonwealth* v. *Watson*, 430 Mass. 725, 729 (2000), quoting *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974). In evaluating the validity of a *Terry*-type stop, we consider both "whether the initiation of the stop was proper in the circumstances and whether the scope was justified by the circumstances." *Commonwealth* v. *Grandison*, 433 Mass. 135, 139 n.6 (2001), quoting *Commonwealth* v. *Watson, supra.* The scope of the intrusiveness of the stop includes the length of the encounter, the nature of the inquiry, the possibility of flight, and danger to the safety of the officers. *Commonwealth* v. *Williams*, 422 Mass. 111, 118 (1996). The scope must be proportional to the "degree of suspicion the police reasonably harbor." *Id.* at 116. When a detention follows from a threshold inquiry that does not reveal further suspicious activity or circumstances, that detention will normally be invalid. See *Commonwealth* v. *Torres*, 424 Mass. 153, 157-159 (1997); *Commonwealth* v. *Borges*, 395 Mass. 788, 790-791 (1985); *Commonwealth* v. *Loughlin*, 385 Mass. 60, 62 (1982).

The circumstances in this case arguably may have justified a threshold inquiry of Gravina in order to ascertain her connection to the defendant and the illegal activity under investigation. However, no such inquiry was made by the police. Gravina's mere association with the defendant, and her admission that the apartment under investigation was hers, were not sufficient to

---

[8]There is nothing in the record that makes clear the length of the detention. Therefore, it is impossible to assess whether the detention was reasonable from that perspective.

provide reasonable suspicion proportionate to her detention (which was for an indeterminate time, see note 8, *supra*), and her involuntary return to the apartment, see note 2, *supra*. The detention of Gravina exceeded the scope of a valid *Terry*-type stop.

In *Summers*, the Court stated that "the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." *Id.* at 701. This misses the point. Constitutional guarantees do not depend on suppositions that police officers will not "exploit" unauthorized detentions or that such detentions will not normally produce useful information. Nor do these guarantees envision subsequent case-by-case analysis of the balance between law enforcement needs and individual privacy rights. That balance was struck in both the Fourth Amendment and art. 14, resulting in the requirement that detentions of this nature be preceded by warrants. It is not our function to revisit it.

What is even more unnerving is that the court today not only embraces for art. 14 purposes the reasoning of *Summers*; it expands on it. In *Summers*, the police detained a suspect whom they inadvertently encountered on the doorstep of his home, searched for and found narcotics in the basement, and then arrested the suspect. *Id.* at 693. Today, this court concludes that the police may wait until a nonsuspect emerges from the premises to be searched, detain that nonsuspect whom they only later learn is connected to the particular residence, bring her back to the premises specified in the search warrant, detain her for an unspecified period of time, and then search the bag she is carrying. Even the logic of *Summers* does not justify this detention and search. Clearly the heightened protection provided by art. 14 does not countenance this further erosion of the warrant requirement.