### COMMONWEALTH vs. MICHAEL CHARROS
### (and three companion cases[1]).

Bristol. January 6, 2005. - March 31, 2005.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Practice, Criminal,* Required finding, Assistance of counsel. *Evidence,* Joint enterprise, Informer, Hearsay, Declaration against interest. *Constitutional Law,* Search and seizure, Arrest, Assistance of counsel. *Search and Seizure,* Warrant, Probable cause, Arrest. *Probable Cause. Error, Harmless.*

At the trial of indictments for trafficking in cocaine, the judge properly denied one codefendant's motion for required findings of not guilty at the close of the Commonwealth's evidence, where the evidence was sufficient for the jury to convict that defendant as a joint venturer. [758-759]

This court concluded that, for purposes of the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, police officers had no authority, under a warrant to search the home of the two criminal defendants, to seize the defendants on a public street, where that location was one mile from the defendants' home and bore no connection to the premises to be searched, and where the officers had no interest in preventing the defendants' flight from the search site or minimizing the risk of harm to the officers; nor did that warrant authorize the officers to return and detain the defendants in their home while the search took place. [759-764]

A Superior Court judge properly denied one criminal defendant's motion to suppress evidence seized from him where police initially stopped that defendant with probable cause to arrest him, based on a confidential reliable informant's having purchased cocaine from him within fifteen days of the date of the application for a search warrant; however, a motion to suppress evidence of a certain sum of cash, which motion was brought by the second defendant, the first defendant's wife and his alleged joint venturer, should have been allowed, where there was no probable cause to justify any arrest of the second defendant [764-765], and the erroneous admission in evidence of the cash she sought to suppress required reversal of her convictions for trafficking in cocaine and the remanding of her case for a new trial [765-767].

No substantial risk of a miscarriage of justice arose at the trial of indictments for trafficking in cocaine from the judge's having declined to order disclosure of the identity of a confidential informant described in the affidavit in support of the application for a search warrant. [767]

A Superior Court judge properly excluded from evidence at a criminal trial a

---

[1]Two against Geraldine Charros and one against Michael Charros.

third party's hearsay statements which did not qualify as statements against penal interest. [767-768]

There was no merit to a criminal defendant's argument that his trial attorney was ineffective because he abandoned the theory of the defense in his closing argument. [768-769]

INDICTMENTS found and returned in the Superior Court Department on October 1, 1998.

A pretrial motion to suppress evidence was heard by *John A. Tierney*, J., and the cases were tried before *Patrick F. Brady*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Dana Alan Curhan* (*Brad Bennion* with him) for Michael Charros.

*Cynthia A. Vincent* for Geraldine Charros.

*Steven Gagne*, Assistant District Attorney (*Alison R. Bancroft*, Assistant District Attorney, with him) for the Commonwealth.

*Richard L. Goldman*, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

SPINA, J. Michael Charros was convicted of trafficking in cocaine in excess of 200 grams, and trafficking within 1,000 feet of a school zone. Geraldine Charros, his wife, was convicted of a lesser included offense of trafficking in cocaine in an amount of twenty-eight grams or more but less than one hundred grams, based on a theory of joint venture. She also was convicted of a corresponding school zone violation. On appeal, the defendants argue that the search warrant for their home did not authorize officers of the New Bedford police department to stop them after they left their home and traveled approximately one mile, and that items seized as a result of their illegal arrest and statements made by Michael should have been suppressed in accordance with the requirements of the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.[2] The defendants raise other issues in these consolidated appeals, including the refusal to order

---

[2] We acknowledge the amicus brief on this issue filed by the Committee for Public Counsel Services.

discovery and the exclusion of evidence concerning the identity of an alleged government informant; claims of ineffective assistance of counsel; and a contention that Geraldine's motion for a required finding of not guilty should have been allowed. We hold that the search warrant did not authorize the stop of the defendants, but that police had an independent basis for arresting Michael. We affirm Michael's convictions, but we reverse Geraldine's convictions and remand her case to the Superior Court for a new trial.

1. *Background.* The jury could have found the following facts. On August 10, 1998, officers of the New Bedford police department obtained a search warrant for the first-floor apartment at 164 Query Street in New Bedford, the residence of Michael and Geraldine Charros.[3]

After obtaining the search warrant, numerous officers in several cars positioned themselves at various locations around 164 Query Street. At approximately 5:45 P.M. a man other than Michael left the house and drove away. Shortly thereafter Michael was seen driving away in a white van. Some officers stopped the van approximately one mile away. Michael was ordered to step outside, and a patfrisk resulted in the discovery of two small paper folds containing cocaine. One fold was randomly selected for analysis and weighed 0.47 grams. It had a street value of $20 to $25. Michael was handcuffed, placed in a patrol car, and driven back to his home.

Geraldine and the couple's eight year old son were also in the van. An officer drove them in the van back to their home. Once inside their apartment both defendants were advised of the Miranda warnings and allowed to examine the search warrants. Geraldine was permitted to arrange for a relative to remove their son from the premises. She was placed in handcuffs.

Detective Paul Oliveira asked Michael if he were willing to cooperate and show them where he kept the cocaine. He indicated he would, and he led the officers to a small room with a roll-top desk from which were seized a number of items, including a shoe box that contained a plastic bag with 244.68

[3]They had a second warrant authorizing the search of a brown pick-up truck registered to Michael.

grams of cocaine, eight small corner bags of cocaine (one was randomly selected for analysis and had a net weight of 0.42 grams), a small corner bag of nonnarcotic white powder, a bottle of Inositol powder, a folded paper packet of cocaine (its net weight was 0.26 grams), several square pieces of paper, $140 in cash, an open box of sandwich bags, a telephone pager, two keys, a triple-beam balance scale, scissors, a butter knife, a Harley Davidson brochure with slash marks on it, and letters and bills addressed to both defendants.

The officers used the keys found in the desk to unlock a strongbox and a safe in a closet off the room where the desk was located. The strongbox contained an envelope with $10,000 cash, a blue bank bag with $8,750 cash, and a white plastic bag containing 28.42 grams of cocaine. The safe contained a .22 caliber handgun and ammunition.[4]

A waste paper basket under the desk contained an empty bottle of Inositol and plastic sandwich bags with corners cut away. Inositol powder is frequently used as a cutting agent to create or stretch a mixture of cocaine for retail sale. Sandwich bags are frequently used in the retail sale of cocaine by placing a small amount of cocaine in a corner, tying a knot in the bag close to the corner holding the drug, then cutting away the unused portion of the bag above the knot, leaving what is known as a "corner bag" of cocaine. Corner bags usually contain a one-half gram mixture of cocaine and sell for $20 to $25 on the street. Based on opinion testimony, the items seized from the desk are not consistent with personal use of cocaine, but are consistent with items used in the sale of cocaine.

From the living room, officers seized a police-band scanner that was "on" and tuned to one of the New Bedford police department frequencies. It was capable of receiving radio communications on the frequency used by the narcotics unit. One purse containing $1,500 cash was seized from the master bedroom. It contained no identification papers. The purse Geraldine had in her possession at the time she was driven back to the apartment also was seized. It contained $821 cash.

---

[4]At the conclusion of all the evidence the judge allowed Michael Charros's motion for a required finding of not guilty as to a charge of unlawful possession of a firearm and a charge of unlawful possession of ammunition concerning these items.

Michael admitted to Detective Oliveira that he did not use cocaine, but had been selling it for about eight years. He said he was not a big dealer, and just sold a little "here and there" to make some money. He said that the approximately 250 grams that he had in the house would last him about one month. Michael explained that he kept the money in the safe, and not in a bank, because he owed $30,000 in child support. He also explained that the .22 caliber handgun and ammunition had belonged to his father, and that his father recently had passed away.

Both defendants testified. Michael denied telling Detective Oliveira that he had been selling drugs for eight years. He testified that he told Oliveira that Joe Ryan had brought the box of drugs to the house for safekeeping just minutes before Michael had been arrested, and that Ryan had been selling drugs for seven or eight years. Michael testified that he never sold drugs, and that he had purchased from Joe Ryan the two paper folds of cocaine he had on his person when arrested. He also denied telling Oliveira that he owed $30,000 in child support, or that he even mentioned owing child support. There had been papers on the roll-top desk that indicated a claim in excess of $30,000 had been made against him for child support, but Geraldine testified that they had retained a lawyer and the claim was reduced significantly.

Geraldine testified that Michael's father had lived with them from January, 1997, until his death in March, 1998. He suffered many medical complications related to diabetes. A leg had been amputated, he was confined to a wheelchair, and he required dialysis. Michael was his father's caretaker during the day, and Geraldine helped out at night by preparing his meals. Because her father-in-law was on a "renal diet," his food portions, especially meat, had to be weighed with precision. The triple-beam scale, which had been kept in the pantry when he was alive, was used for this purpose, and no other. She extended his meals by sprinkling Inositol over the food. She would prepare his meals in advance and set them aside in plastic sandwich bags. After the father died, the scale was stored in the closet, and the Inositol and sandwich bags were stored in the roll-top desk. The scale had not been used after the father's death

because she dropped and broke it when placing it in the closet. The police removed it from the closet and placed it on the desk during the search of her apartment.

Geraldine also explained uses for other items that had been offered by the Commonwealth as paraphernalia used in the drug trade. The pager was hers, and was used to reach Michael at a time when their child frequently became ill at school. She testified that she used the butter knife as a letter opener, and that she attended to the family bills at the roll-top desk. The scratches on the Harley Davidson brochure were the result of Michael's cutting Harley Davidson emblems from the brochure and laminating them onto magnets.

The police scanner belonged to the father, who had listened to it constantly until his death. The father's monthly pension checks, which totalled approximately $1,100, went to his care, and to compensate Michael for giving up his job to serve as his father's caretaker. The $10,000 found in an envelope in the strongbox was money that the father had saved. As for the $8,750 in the blue bank bag, $7,000 were proceeds of two life insurance policies the father had left to the defendants, $1,100 was money Geraldine's employer had reimbursed her for a short term loan she had made, and the rest was "house money" Geraldine had put aside.

Geraldine testified that she made short-term loans to her employer, a trucking company, to help keep the company operating. The company was in bankruptcy, and she used her credit cards to pay for current company expenses. The company would then reimburse her and record the payment on its books as "toll money." Her motive for helping in this manner was to build up a good personal credit rating which she could someday use to obtain a mortgage to purchase a home. She had twenty-six credit cards, all in good standing.

She explained that the $821 in the purse she had at the time of her arrest consisted of $800 that was ready to be used to meet her employer's needs, and she had taken $21 from the strongbox just before they were stopped by police. It was to have been used to buy supper. The $1,500 in her purse in the master bedroom was a reimbursement from her employer.

When Michael's father died, Michael became depressed. He

started drinking alcohol to excess, and he resumed the use of cocaine after a period of abstention of approximately four years. This became a source of marital problems. Michael obtained his cocaine from Joe Ryan. Ryan appeared at their apartment at 5:30 P.M. on August 10, 1998. He had a cardboard box (the shoe box with the 244.68 grams of cocaine) which he asked Michael to hold for him until the next day because he had "something going down with the cops." Michael told Ryan he did not want anything to do with it, but Ryan threatened him. Ryan placed the box on the roll-top desk. Ryan also discarded a bag of trash (containing the empty Inositol bottle and the sandwich bags with corners cut out) in the waste basket under the roll-top desk.

Michael left the room for a short time while Ryan used their telephone. When he returned, Ryan had the keys to the strongbox and the safe in his hand. Two weeks earlier, Ryan had seen Michael retrieve the keys and open the strongbox to get money to buy cocaine. Both Michael and Geraldine testified they had never seen the white plastic bag containing 28.42 grams of cocaine that police seized from the strongbox. Geraldine testified that when she opened the strongbox shortly before Ryan arrived on August 10, to get $20 for supper, the bag of cocaine was not in the strongbox.

Michael and his sister, Linda, both testified about threats that Ryan had communicated to them in late winter and spring of 1999 about what he would do to Michael if Michael continued to accuse Ryan in court. Ryan made it known that the source of his information about Michael's statements had been Detective Oliveira.

2. *Required findings of not guilty.* Geraldine claims error in the denial of her motion for required findings of not guilty at the close of the Commonwealth's evidence. She argues specifically that the Commonwealth failed to prove that she acted as a joint venturer. We review this claim under the standard of *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), to determine whether the evidence, in its light most favorable to the Commonwealth, is sufficient to permit any rational jury to convict. In order to succeed on a theory of joint venture, the Commonwealth must prove that the defendant was "(1) present

at the scene of the crime, (2) with knowledge that another
intends to commit the crime or with intent to commit a crime,
and (3) by agreement is willing and available to help the other
if necessary." *Commonwealth* v. *Bianco*, 388 Mass. 358, 366,
*S.C.*, 390 Mass. 254 (1983).

A jury could have inferred that Geraldine was knowingly
present in the apartment, where Michael trafficked in cocaine. A
large volume of cocaine and paraphernalia for cutting, weigh-
ing, and packaging cocaine for distribution were kept openly, on
a desk to which she had access. Her mail was kept in the same
place. The evidence warranted a finding that, in the circum-
stances, she had to know that a substantial cocaine distribution
operation was being run out of her home. With respect to the
third element of joint venture, a jury reasonably could infer that
Michael's cocaine trafficking operation generated large amounts
of cash, and that Geraldine assisted in the management or
concealment of the proceeds of that operation by holding
proceeds in her purses. The motion for required findings was
properly denied.

3. *Suppression issues.* The search warrant issued at 2:15 P.M.
on August 10, 1998. The motion judge found that the officers
set up surveillance of the premises at 164 Query Street sometime
between 5:30 and 6 P.M. that evening. Their intention was to
wait for Michael to leave the premises and then stop him within
a few blocks, that is, as soon as he was out of view from his
home. They believed, based on training and experience, that
this was the safer course, and that evidence possibly could be
destroyed by someone inside the house if the defendants were
stopped in front of the house. The judge accepted the officers'
concerns, and he found that the ability of the officers to stop
Michael's van before it traveled nearly one mile was affected
by Query Street being a one-way thoroughfare. Relying on
*Michigan* v. *Summers*, 452 U.S. 692 (1981), the judge concluded
that the officers did not act unreasonably, within the meaning of
the Fourth Amendment.

The defendants argue the officers' authority under the warrant
to detain them exists only if they are on the premises at the

time police conduct the search.[5] They further argue that the officers had no authority to seize them one mile from their home, return them, and detain them inside while officers conducted a search. Even if their detention were permitted under the Fourth Amendment, they maintain that it is not acceptable under the more protective guarantee of art. 14, which the motion judge did not address.

a. *Authority under the warrant.* The Supreme Court held in *Michigan* v. *Summers, supra* at 705, that, "for Fourth Amendment purposes . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." In that case the Court approved the seizure of an occupant as he was descending the front steps of his residence, the house to be searched. He was returned and detained inside while officers searched his house. The Court reasoned that "limited intrusions" on personal liberty incident to a search may be justified under the Fourth Amendment on less than probable cause by "substantial law enforcement interests . . . so long as police have an articulable basis for suspecting criminal activity." *Id.* at 699.

The Court identified three law enforcement interests that justify a detention on less than probable cause when officers execute a search warrant. The first is "preventing flight in the event that incriminating evidence is found." *Id.* at 702. The second interest is "minimizing the risk of harm to the officers. Although no special danger to the police [need be shown], the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." (Footnote omitted.) *Id.* at 702-703. The third law enforcement interest involves "the orderly completion of the search [that] may be facilitated if the occupants of the premises are present.

---

[5]Because the defendants were residents of the premises, we are not concerned with the authority under this warrant to search any person present. See *Commonwealth* v. *Catanzaro*, 441 Mass. 46, 51-52 n.10, 57-58 & n.16 (2004).

Their self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand." *Id.* at 703.

With respect to the requirement that officers have an "articulable and individualized suspicion" of criminal activity, the Court said this requirement is satisfied, at least as to occupants, by circumstances underlying the issuance of the warrant, namely, a judicial officer's finding of probable cause to believe that a crime is being committed in the house. *Id.* at 703.

The Court noted that the detention of a person incident to a search of his home is but an "incremental intrusion on [his] personal liberty," *id.* at 703, when compared to the "substantial invasion of [his] privacy" authorized by the warrant for his home. *Id.* at 701. The Court further observed that "the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention. Moreover, because the detention in this case was in the respondent's own residence, it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." (Footnotes omitted.) *Id.* at 701-702. The Court concluded that "the detention of this respondent was 'substantially less intrusive' than an arrest." *Id.* at 702.

The present case has little in common with *Michigan* v. *Summers, supra.* The seizure of these defendants did not occur in the privacy of their home, but at a location one mile away with no connection to the premises to be searched. Moreover, it occurred in spectacular fashion by driving a police car across their path to cut off their forward progress while they were driving on one of the busiest streets in New Bedford during evening rush hour traffic. The seizure produced all the indignity of an arrest in full view of the public. This was hardly an "incremental intrusion" on personal liberty, but a significant deprivation of liberty far beyond what was contemplated in *Michigan* v. *Summers, supra* at 703. The circumstances of the seizure of the

defendants also had the palpable potential for exploitation by the officers, who otherwise had no authority to search the van in which the defendants were traveling. See *id.* at 701.

Two of the three interests of law enforcement identified by the Supreme Court that arise during the execution of search warrants did not exist in this case. Once the defendants had left their home, unaware of the existence of the warrant, the officers had no interest in preventing their flight from the search site during the search or minimizing harm the defendants might cause during a search. Other courts that have considered this issue under the Fourth Amendment have reached a similar conclusion. See *United States* v. *Edwards*, 103 F.3d 90 (10th Cir. 1996) (defendant seized three blocks from search site and detained at point of seizure while search completed); *United States* v. *Sherrill*, 27 F.3d 344 (8th Cir.), cert. denied, 513 U.S. 1048 (1994) (defendant seized one block from search site); *State* v. *Crank*, 212 Ga. App. 246 (1994) (defendant seized two to three miles from search site); *State* v. *Ruoho*, 685 N.W.2d 451 (Minn. Ct. App. 2004) (defendant seized one-half mile from search site). The Supreme Court of Pennsylvania has reached a similar conclusion under art. 1, § 8, of the Pennsylvania Constitution. See *Commonwealth* v. *Graziano-Constantino*, 553 Pa. 150 (1998) (defendant seized two and one-half miles from search site). With respect to the third law enforcement interest recognized under *Michigan* v. *Summers, supra* at 703, the orderly execution of the warrant, the officers could have ensured the presence of the defendants by executing the warrant earlier, when they knew the defendants were home, or they could have waited until their return. The officers had other viable alternatives.

The Commonwealth, relying on *Commonwealth* v. *Catanzaro*, 441 Mass. 46 (2004), and *United States* v. *Cochran*, 939 F.2d 337, 339 (6th Cir. 1991), cert. denied, 502 U.S. 1093 (1992), argues that the rule in *Michigan* v. *Summers, supra*, does not depend on the geographic proximity of the seizure of an occupant to his residence (the search site), but rather on the reasonableness of police performance, that is, whether officers seized the occupant as soon as practicable after his departure from his residence. Those cases are distinguishable.

In *Commonwealth* v. *Catanzaro, supra,* we held that it was reasonable under the Fourth Amendment and art. 14 to stop an occupant of an apartment to be searched as she was walking down the driveway fifty to seventy feet from her apartment building. She was stopped as soon as reasonably practicable on leaving, and there was a nexus between the place where the stop occurred and the premises covered by the warrant. In those circumstances, the stop was merely an incremental intrusion beyond what had been authorized by the warrant. *Id.* at 57. Here, there was no connection between the place of seizure and the premises to be searched, and the defendants were stopped on a public street, away from their home.

In *United States* v. *Cochran, supra,* there were special circumstances supported by specific facts that do not exist here. The defendant there was believed to carry a firearm at all times, and the interior of his residence was protected by a guard dog. Officers decided to stop him as he was driving off his property and request his assistance in entering his home. The defendant was stopped as soon as practicable, on a public road a short distance from his home. The court concluded that in the circumstances the initial stop was valid. The purpose and scope of the initial stop were broadened by the defendant's conduct as police approached his car, leading to searches of the car that were justified under different principles. In the case before us there were no such exigencies, and the officers had planned in advance to stop the defendants two blocks from their home and take them back.

It is important to recognize the need of law enforcement officers to "exercise unquestioned command" of a search site and detain persons on the premises in the interest of the safety of all involved, and to prevent the destruction of evidence. *Michigan* v. *Summers, supra* at 702-703. However, this authority is incidental to, and exists contemporaneously with, the execution of the warrant. It arises from necessity, that is, from the need to control the inherent volatility produced by the search environment. It requires no special showing. *Id.* To conclude that such authority arises in anticipation of the execution of the warrant, as the Commonwealth suggests, requires a distorted reading of the *Summers* case that effectively would eliminate

any meaningful relation between the place of the seizure and the premises to be searched, and it would give officers authority to act in anticipation of the execution of a warrant comparable to making an arrest without having to meet the requirements of an arrest. Moreover, if officers believe the element of surprise is needed to conduct a search safely, they may apply for a "no-knock" warrant and make the requisite showing of probable cause to believe that announcing themselves in advance of execution of the warrant would jeopardize their safety or result in the destruction of evidence (one of the three law enforcement interests identified in *Michigan* v. *Summers, supra* at 702-703). See *Commonwealth* v. *Scalise*, 387 Mass. 413, 418, 421 (1982). A no-knock warrant was not sought here. The authority to seize and detain an occupant incident to a search makes sense only if it is seen as arising contemporaneously with the officers' arrival at premises to execute the warrant, and not in preparation for the execution of that warrant.

For the foregoing reasons we conclude that, for purposes of the Fourth Amendment, the officers had no authority under the search warrant to seize the defendants one mile from their home, or to return and detain them in their home while the search took place. Because we apply the same general analysis to a claim that an off-premises seizure of an occupant incident to a search violates art. 14, see *Commonwealth* v. *Catanzaro, supra* at 54-57, we reach the same conclusion as a separate, adequate, and independent ground under art. 14. This case does not provide the opportunity for us to decide whether art. 14 affords greater protection than the Fourth Amendment with respect to off-premises seizures of occupants incident to the execution of a search warrant.

b. *Probable cause to arrest.* The conclusion we reach with respect to the officers' authority under the warrant does not necessarily mean that the order denying suppression must be vacated. The defendants argue that the officers had no other justification for stopping and detaining them. We disagree, as to Michael. The affidavit in support of the application for the search warrant indicates that a confidential reliable informant, see *Commonwealth* v. *Crawford*, 417 Mass. 40 (1994), purchased cocaine from Michael Charros within fifteen days of

the date of the application for the warrant. The defendants do not challenge the validity of the search warrant, which was issued based, in part, on this information. This information constitutes probable cause to believe that Michael had committed a felony as proscribed by G. L. c. 94C, § 32A (*a*). In addition to its support for the probable cause requirement for the issuance of the search warrant, this evidence satisfies the probable cause requirement for an arrest. See *Gerstein* v. *Pugh*, 420 U.S. 103, 111-112 (1975), and cases cited. Consequently, the officers had the authority to arrest Michael without a warrant. See *United States* v. *Watson*, 423 U.S. 411 (1976); *Commonwealth* v. *Holmes*, 344 Mass. 524 (1962). The initial stop of Michael was valid, as it was based on probable cause to arrest,[6] and his motion to suppress was properly denied. However, there was no probable cause to justify any arrest of Geraldine. Her motion to suppress the $821 cash found in her purse should have been allowed.

c. *Harmless error.* We must determine whether the erroneous admission of evidence of the $821 found in the purse Geraldine was carrying requires reversal of her convictions. Constitutional errors that have been preserved are reviewed to determine whether they are harmless beyond a reasonable doubt. See *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998). Under this standard, the burden shifts to the Commonwealth, see *Commonwealth* v. *MacDonald (No. 1)*, 368 Mass. 395, 399 (1975), to show that the wrongfully admitted evidence did not contribute to the verdicts. See *Commonwealth* v. *Peixoto*, 430 Mass. 654, 660 (2000). The Commonwealth has not addressed this issue in its brief.

We begin with the observation that it is difficult on this record to weigh what was tainted and what was not tainted by the wrongful admission of the money in the purse Geraldine had in her possession at the time of the initial stop. This includes Geraldine's testimony. Geraldine offered an explanation at trial for

_____

[6]"Although to justify the seizure neither the Commonwealth nor the judge relied on this theory, the general rule is that, if the evidence is admissible, 'it is of no consequence whether the reason assigned by the judge was accurate.' " *Commonwealth* v. *Signorine*, 404 Mass. 400, 403 n.1 (1989), quoting *Mathews* v. *Orlandella*, 320 Mass. 386, 388 (1946).

the $821 in her purse, thereby admitting possession of the item that should have been suppressed. Some courts hold that such voluntary testimony concerning the item that should have been suppressed renders any error harmless. See *Muff* v. *State*, 254 Ga. 45 (1985); *Commonwealth* v. *Hart*, 471 Pa. 271 (1977). However, at least one commentator has suggested that this approach, which places a defendant in a "Catch-22" position, is little more than a manipulation of the harmless error rule, and a defendant's testimony explaining illegally admitted evidence should be considered tainted. See 6 W.R. LaFave, Search and Seizure § 11.7(f), at 482-484 (4th ed. 2004). In an early case involving the exclusionary rule, this court, with no analysis, disregarded the testimony of a defense witness offered on the subject of illegally admitted physical evidence. See *Commonwealth* v. *McCleery*, 345 Mass. 151 (1962). Moreover, the Supreme Court has said that one of the "cumulative prejudicial effect[s]" of the admission of physical evidence that should have been suppressed includes the damaging admissions made by a defendant in testimony offered to explain the wrongfully admitted evidence. See *Fahy* v. *Connecticut*, 375 U.S. 85, 91 (1963).

Geraldine's testimony, while apparently helpful to her on the question of her connection to the 244 gram bag of cocaine, as well as the broken condition of the triple-beam scale, may have had the opposite effect as to the twenty-eight gram bag of cocaine in the strong box, which she admitted opening to get $20 just before her arrest. This $20 is a portion of the evidence that should have been excluded. It is particularly significant because the Commonwealth contends it is the proceeds of the crime of selling cocaine. Geraldine's explanation of where, when and why she obtained it established that she had access to the locked strong box used to conceal the twenty-eight grams of cocaine, which appears to have been the basis for her conviction. It is virtually impossible to say, on this record, whether Geraldine would have testified had the evidence been suppressed. However, we think the evidence of the $821 and Geraldine's testimony were at least as damaging as the the few pieces of mail and the purse with $1,500 (but no identification), the only other evidence connecting her to the drugs.

The case against Geraldine was not strong. We are not confident that the admission of the $821 found in her purse, together with her testimony explaining the source of at least some of that money, did not contribute to the verdicts. She is therefore entitled to a new trial.[7]

4. *Disclosure of confidential informant.* There is no merit to Michael Charros's claim of error in the judge's failure to order disclosure of the identity of the confidential informant "CI-1" described in the affidavit in support of the application for the search warrant. Michael filed a motion for disclosure of CI-1's identity, but he did not press the motion. The issue is waived, see *Commonwealth* v. *Padilla*, 42 Mass. App. Ct. 67, 71 (1997), but reviewable for a substantial risk of a miscarriage of justice.

Michael was trying to show that "CI-1" was Joe Ryan, and that Ryan was acting with knowledge of New Bedford police when he allegedly arrived at the Charros home on August 10, 1998, with 244 grams of cocaine. Instead of pressing the motion for disclosure, Michael pursued an alternative course by filing a motion to reopen the hearing on the motion to suppress. At a hearing on the motion to reopen, which had been preceded by discovery of police reports concerning Ryan, the detectives testified that they did not know Joe Ryan on August 10, 1998. The judge credited that testimony.

Michael was permitted discovery concerning Joe Ryan, as well as a hearing on his motion to reopen. He claims no error relating to the course of that hearing, e.g., that his questions were unfairly limited. Once it became apparent that Ryan could not have been "CI-1," Michael had no further interest in the identity of "CI-1." He has failed to show any error in the judge's decision to credit the testimony of the officers. Although he did not learn the identity of "CI-1," Michael nevertheless was able to present his defense that Ryan delivered the drugs to his home, and he offered Ryan's purported explanation that he had "something going down with the police." There has been no showing of a substantial risk of a miscarriage of justice.

5. *Statement against penal interest.* There is no merit to Michael's claim of error in the exclusion of statements attribut-

---

[7]Because of the conclusion we reach on this issue, we need not address the remaining issues raised in her brief.

able to Ryan to the effect that he apologized to Michael's sister and to Geraldine Charros for what he did, but he had to solve his own problems with the police. The statements were properly excluded as hearsay, and they did not qualify as statements against penal interest. There had been no showing that Ryan was not available, and the statement had not been corroborated by circumstances clearly indicating trustworthiness. See *Commonwealth* v. *Drew*, 397 Mass. 65, 73 (1986), quoting *United States* v. *Thomas*, 571 F.2d 285, 288 (5th Cir. 1978).

Both defendants testified that they saw Ryan the morning of their trial when he drove by the court house. He was, therefore, not unavailable. He was not called to testify, and unavailability due to the possibility of a claim of privilege against self-incrimination will not be presumed. See *Commonwealth* v. *Lopera*, 42 Mass. App. Ct. 133, 137 n.3 (1997).

The primary corroboration offered for the accuracy of Ryan's statements is the testimony of Michael and Geraldine Charros that Ryan delivered the drugs to their home on August 10, 1998, because of some difficulty he was having with the police, and that the police also saw a man, whom the defendants contend was Ryan, leaving the house shortly before the defendants. However, the police could not say that the man they saw leaving was Ryan, or that he came from the defendants' apartment. Moreover, even if it were Ryan, the statement attributable to Ryan does not support Michael's assertion that Ryan was acting with knowledge of the police. There is no evidence that police were aware of Ryan's activities as a drug dealer until about July, 1999, nearly one year after the arrests in this case. This does not constitute circumstances clearly indicating trustworthiness of statements made to a defendant and his sister, both of whom have a strong interest in the outcome of the case. There was no error.

6. *Ineffective assistance.* Michael contends that his attorney was ineffective because he abandoned the theory of the defense in his closing.

Defense counsel had tried the case on the theory that Joe Ryan and the police had "set Michael up." This necessarily meant that the police were lying at trial. Although he did not expressly accuse them of lying, and at times said he was not ac-

cusing them of lying, he unmistakably implied as much, and no reasonable juror could have interpreted counsel's closing as an abandonment of the attorney's very aggressive and well managed trial strategy.

Michael's Charros's convictions are affirmed. Geraldine Charros's convictions are reversed, the verdicts set aside, and her case is remanded to the Superior court for a new trial.

*So ordered.*