Billings, Thomas P., J.
The defendant is charged with trafficking in cocaine (28 grams or more), possession of heroin with intent (subsequent offense), possession of cocaine with intent to distribute (subsequent offense), and three school zone violations. The charges concern the fruits of a warrantless search on April 3, 2011 of a Honda Civic in which the defendant was a passenger, followed by a warranted search on May 11, 2011 of the defendant’s person and a Toyota Camiy he was driving.
The defendant moved to suppress the fruits of both searches.[1] On March 5, 2012 the Court (Inge, J.) allowed the motion to suppress as to the Honda. On June 18, 2012 I heard argument on the second motion, that pertaining to the warrants to search the Toyota and the defendant’s person, and on August 20, 2012, I allowed it, suppressing the evidence seized in the execution of the warrant for lack of nexus between the items sought and the place(s) to be searched. (Paper #21.) [30 Mass. L. Rptr. XXX.]
The Commonwealth then moved for reconsideration, arguing that nexus or not, there was probable cause to arrest the defendant or at least, reasonable enough suspicion to stop him; this was all the police had done when they discovered the first of four stashes of cocaine; and the discoveries of the remainder fell within well-established exceptions to the warrant requirement. The Commonwealth requested an evidentiary hearing in which to establish these facts.
The requested evidentiary hearing was held on December 19, 2012 and January7,2013, and counsel filed their briefs on Januaiy 28. The issues are novel, and both sides’ briefs thoughtfully prepared and of great assistance.
For the reasons that follow, the order of August 20, 2012, allowing the defendant’s Motion to Suppress, shall stand.
*647 FINDINGS OF FACT
At the hearing, I heard testimony from four witnesses — Detectives Janie Munro, Agrit Collazo, and Kevin Donofrio and Sergeant Louis Cherubino, all of the Cambridge Police. No civilian testified or (excepting the defendant) was identified by name. Based on the credible evidence and assigning to the Commonwealth the burden of proving all necessary facts by a preponderance of the evidence,[2] I find the following facts.
1. The Cambridge Police maintain a “hot line,” which citizens may call to leave a voice-mail message reporting drug dealing or other criminal activity. Anonymity is promised, and calls are not traced. In the month of April 2011, the hotline received two anonymous tips reporting that someone was selling drugs, using a green Toyota Camiy, plate number 526HHO, as transportation.
2. The police ran the plate, which came back to someone other than the defendant.
3. Partial confirmation of the anonymous tips came from three confidential informants.
a. CI#1 reported that a black male, in his thirties, 5’7" to 5’8" whom he[3] knew as “Moe” had sold him cocaine, driving to a location arranged when CI#1 called his cell phone (whose number Cl# 1 supplied to the police).
b. CI#2 also knew Moe, whom he described as a black male, medium build with facial hair, in this thirties, and had bought cocaine from him using the protocol described by CI#1.
c. CI#3, a drug user, reported that Moe (black male, short and stocky, about 35) was selling drugs in Cambridge and drove a dark-colored Toyota whose plate number ended in HHO.
4. CI#1 and CI#2 were new informants. CI#3 had provided information numerous times in the past, resulting in eight arrests in Middlesex County, one in Essex, some number of convictions, and apprehension of a fugitive by United States Marshals.
5. The police opened an investigation, and decided to seek corroboration of the informants’ information concerning Moe by way of controlled buys.
6. In the week of May 1, 2011 during daylight hours, Detectives Munro and Collazo, both in plain clothes, met with CI#2; searched him, found no cash or drugs, and provided him with a quantity of cash which they had photocopied. He called Moe in the presence of the detectives, who could hear a male voice on the other end, arranged a meeting, and told the detectives the location. They drove him to within walking distance of the specified place. Collazo went on to the meeting location, while CI#2 walked there with Munro, also on foot, trailing at a discreet distance behind. Collazo saw the two approach, then saw a green Camiy with plate number 526HHO arrive and park, about four car lengths behind him and across the street. The defendant exited the Camiy, walked past Colazzo, and met up with CI#2, 60 to 70 feet away from where Collazo sat. Collazo, who had and used a 10 x 50 binocular, saw them engage in what appeared to be a hand-to-hand exchange, though he could not see what was exchanged. Detective (now Sgt.) Cherubino, assigned to surveillance of the meeting, also saw what appeared to be a hand-to-hand exchange of something(s) he could not see. The defendant walked back to the Camry and drove away, while CI#2, in view of at least one detective throughout, walked back toward Munro. Collazo, Munro and CI#2 met up, and CI#2 produced a bag containing a white substance which he said he had just acquired from Moe. The substance was visually consistent with, and field tested positive for, cocaine.
7. That same week, Munro and Collazo effected a second controlled buy, this time using CI#1. The same protocol (including a call to “Moe” to arrange a meeting, a search of the Cl, provision of currency, and surveillance of the Cl to, during, and from the meeting) was used as before, except that Munro and Collazo waited in their vehicle. Detective (now Sgt.) Cherubino watched from his unmarked vehicle as CI#1 walked from the car to the meet location, where the defendant drove up in the Camiy, pulled over and stopped, and CI#1 approached and got into the front passenger’s seat. After a short interval CI#1 exited, the Camiy drove away, and CI#1 walked back to the waiting Munro and Collazo (who saw CI#1 before he left Cherubino’s sight). CI#1 handed over a bag similar to that obtained earlier from Cl# 2, containing a white powder that looked like, and field tested as, cocaine, which he reported having acquired in the meeting with Moe. He was searched for drugs and cash, and sent on his way.
8. The week of May 8, the detectives called upon CI#1 once more. The same procedure was followed as in the second buy (call to “Moe” to arrange a purchase, Cl searched, provided with photocopied cash, and surveilled to, during, and from the meet), except that Det. Donofrio and Det. Brian Hussey, together in an unmarked vehicle, were added to the surveillance of the meet location. As in the second buy, Cl# 1 entered the Camiy, left after a veiy short stay, and produced for the waiting Munro and Collazo a bag of white powder that appeared to be, and was field tested as, cocaine. CI#1 said he had purchased the bag from Moe.
9. The police had a booking photo of the defendant, which they showed separately to Cl# 1 and CI#2. Both said the subject was Moe, who had sold them cocaine.
10. By this time if not before, the police had probable cause to believe that the defendant had distributed cocaine on at least three occasions.
11. On May 11, the police obtained the aforementioned warrants to search the Camry and the *648 defendant’s person. A team of detectives went looking for them.
12. At about 6:45 p.m., the Camiy was spotted, legally parked on Norfolk Street near the intersection with Worcester Street. No one was inside. The detectives spread out to watch for the defendant.
13. Soon afterward and still in daylight, the defendant was spotted approaching up Norfolk Street against traffic (Norfolk is one-way), accompanied by a woman. He went to the driver’s door; she, to the passenger’s.
14. Detectives Collazo and Donofrio approached the defendant; Detective Cherubino, the female. She was questioned and released.
15. Donofrio stopped the defendant as he was about to enter the car; identified himself verbally and with a display of his badge; said they had a search warrant for his person; placed him up against the Camiy; and took his right wrist in order to apply handcuffs. Both he and Collazo saw the defendant drop or toss an item to the ground with his left hand. Collazo picked it up while Donofrio finished cuffing the defendant. The item turned out to be a plastic bag containing a number of smaller bags, within each of which was a substance consistent in appearance with cocaine. A search of the defendant yielded $256 in U.S. currency, a cell phone, and the key to the Camry.
16. Donofrio could see, in plain view on the Camiy’s back seat, a dinner plate, which he thought might have been used to crush crack cocaine into powder. He pointed it out to Detective Liberacki, who had been assigned the task of executing the search warrant pertaining to the Camiy. Liberacki seized the plate and a butter knife, and reported to Donofrio that the plate held visible residue with the appearance of cocaine.
17. The defendant was arrested and brought to the station for booking. During booking, three more bags containing a white powder were found on his person.
18. There was no evidence concerning the Cambridge Police policy regarding vehicle impoundments and/or inventoiy searches, or whether the female accompanying the defendant was a licensed driver. Believing in good faith that they had valid warrants to search both the Camiy and the defendant’s person, the police did not inquire of the defendant how he would like the Camry dealt with, once he was incapacitated from driving it home.
19. The officer’s return of the warrant to search the Camiy reports that the police found a cigarette box containing three bags of a brown powdered substance; a serving plate (this is the one that Donofrio saw) and a cheese knife, both with white residue; a bag containing a white powdered substance; and a piece of mail addressed to the defendant. Other than the serving plate, there is no evidence of where within the vehicle these items were found.
20. The officer’s return of the warrant to search the defendant’s person lists a cell phone, $256 in U.S. currency, a plastic bag containing individual bags of white powdered substance, and three bags of white rock substance; the bags were the items found on the street and at booking, respectively.
21. If the detectives had come to arrest the defendant rather than to search his car and his person, discovery of the drugs on the ground, those later found at booking, and the plate on the back seat would have been certain as a practical matter. The plate having visible residue that appeared to be cocaine, it was also certain as a practical matter that the officers would follow up by searching the Camiy for other contraband, and that they would have found the cigarette box with three bags of brown powder (heroin) and the bag of white powder (cocaine).
22. The police would not, however, have arrested the defendant for the controlled buys, because to do so would require divulging the names of CI#1 and CI#2, thus forfeiting the trust of these and other informants in the future.
CONCLUSIONS OF LAW
In the earlier decision, I ruled the search warrants invalid for failure to meet the “nexus” requirement; i.e., for lack of probable cause to believe that the contraband sought would be found in the places to be searched. What transpired was, therefore, a warrant-less search, although the detectives — who, I find, acted at all relevant times in good faith — did not believe it to be so.
The police indisputably had probable cause to believe that the defendant had committed the felony of distributing cocaine at least three times in the ten days preceding his apprehension. This would have entitled them to arrest and charge him, had they been so inclined, for the crimes he had committed in the controlled buys. No warrant would have been required for an arrest on the street or other public place; G.L.c. 94C, §41; United States v. Watson, 423 U.S. 411, 423, 424 (1976); Commonwealth v. Hason, 387 Mass. 169, 173 (1982); and there would be no staleness issue as to any of the three sales; Commonwealth v. Walker, 370 Mass. 548, 560 (1976) (“Unlike probable cause to search, probable cause to arrest, once formed will continue to exist for the indefinite future, at least if no intervening exculpatoiy facts come to light,” quoting United States v. Watson, 423 U.S. 411, 449 (1976) (Marshall, J., dissenting)).
An arrest, had it occurred at the same time and place as the actual stop on Norfolk Street, would inevitably have resulted in discovery of the drugs thrown on the ground and those found on the defendant’s person at booking, as well as the residue-bearing dinner plate in plain view on the back seat. Discovery of the plate would have provided probable cause to search the car, which search would fall under the automobile exception to the warrant requirement, *649 see Commonwealth v. Eggleston, 453 Mass. 554, 557-58 (2009),[4] and this would have resulted in discovery of the rest of the contraband on which the charges against the defendant are founded.
In this case, however, there is no reason to believe that the police would have made an arrest — ever—for crimes their confidential informants witnessed and in which they participated. Confidential informants (with or without controlled buys) are usually employed to develop probable cause for a search. If all goes according to plan, the suspect is then charged with the contraband uncovered in the search. In this scenario, the informant’s identity ordinarily need not be disclosed in the ensuing court proceeding. Commonwealth v. Ennis, 1 Mass.App.Ct. 449, 501-02 (1973).
The reason behind the so-called “informer’s privilege” is obvious: to encourage “citizens to communicate their knowledge of the commission of crimes to law enforcement officials ... by preserving their anonymity.” Roviaro v. United States, 353 U.S. 53, 59 (1957). In the present-day business of narcotics investigation, of course, informants may be motivated less by a sense of civic duty than by a desire for advantage in their own compromised legal situation; among those willing and able to perform controlled buys, one suspects, this is nearly always the case. Still, the police rely on them heavily, use them frequently and repeatedly, and their confidentially is, in most cases,[5] legally assured.
All of this changes, of course, when the would-be confidential informant is a percipient witness to the crime charged; then, his identity must be revealed. Commonwealth v. Mello, 453 Mass. 760, 764 n.5 (2009), citing Commonwealth v. Lugo, 406 Mass. 565, 572 (1990), and Ennis at 501-03. Thus, although the encounter between the detectives and the defendant on Norfolk Street legally could have been an arrest, in the real world it wasn’t, and never would have been.
In support of the searches in this case, the Commonwealth points to Commonwealth v. Charros, 443 Mass. 752, cert. denied, 546 U.S. 870 (2005), and Commonwealth v. Velez, 77 Mass.App.Ct. 270 (2010). In each case, the police had a valid warrant to search the defendant’s home, but ran afoul of the rule of Michigan v. Summers, 452 U.S. 692, 705 (1981),[6] when they stopped and detained the defendants, who were unaware of the warrant and the search on a public street, away from the home, and thus posed no risk of flight or to officer safety. In Charros, the SJC held that although the warrant to search the home did not authorize the stop, detention, and accompanying frisk of the occupants (a husband and wife) over a mile away, but that a series of controlled buys conducted through confidential informants provided probable cause to arrest the husband without a warrant, even before the discoveries back at the house. This, the court held, obviated the need to suppress the fruits of the search of the husband.[7] 443 Mass. at 760-65. In Velez, the Appeals Court applied the Charros holding to very similar facts, and similarly held that probable cause provided by controlled buys by confidential informants authorized a detention of the defendant that the warrant and the Summers doctrine did not.
Three additional cases have looked to Charros in analogous situations.
In Commonwealth v. Abreu, 77 Mass.App.Ct. 1123 (2010) (Rule 1:20 decision), the defendant was arrested after a warrant to search his home for drugs was obtained but before it was executed. The Appeals Court held that the arrest was “supported by probable cause to believe that he had repeatedly sold cocaine to the confidential informant” who had provided the information on which the warrant was based.
In Commonwealth v. King, 66 Mass.App.Ct. 1118 (2006) (Rule 1:28 decision), the police began a warranted search of the defendant’s apartment for drugs when only his girlfriend was present. The warrants had been obtained with two controlled buys by a confidential informant. Ten minutes after the search began, the defendant rang the buzzer downstairs; the police met and escorted him to the apartment; frisked him; and found an unlicensed handgun. The Appeals Court again held, on the strength of Charros, that “the affidavit provided probable cause to issue a search warrant; the same evidence of narcotics dealing satisfied the probable cause requirement for an arrest.”
In Commonwealth v. Ilges, 64 Mass.App.Ct. 503 (2005), the police had a warrant to search the defendant’s home, obtained on the strength of information from two confidential informants whose veracity and basis of knowledge were adequately established, one of whom reported that the defendant was planning a drug transaction on a particular evening between 5:00 and 7:00 and would travel to it from his home carrying narcotics. A surveillance team watched as he drove away from the home on a motorcycle. Officers followed and stopped him, told him of the warrant, pat-frisked him, discovered a large amount of currency, and obtained incriminating statements. The Appeals Court found in this a valid Terry stop, but an invalid frisk; yet held that “(t]he police here had an adequate basis on which to arrest. If there was a right to arrest, there was a right to search.” 64 Mass.App.Ct. at 516.
In each of these five cases there was a valid warrant to search the defendant’s home. The other commonality among them is that the defects in police procedure were purely technical; a matter of mistaken timing and/or location, nothing more. Overlooking such minor miscues poses no great potential for mischief.
In this case, by contrast, the defects were fundamental: there was no valid search warrant, and no *650 probable cause to search either the defendant’s automobile or his person.[8] The fact that no bad faith was involved does not, under Article 14, salvage an unconstitutional search. Commonwealth v. Valerio, 449 Mass. 562, 569 (2007) (“Massachusetts has never adopted the ‘good faith’ exception” laid down, for Fourth Amendment jurisprudence, by United States v. Leon, 468 U.S. 897, 926 (1984)).
Attempting to justify the encounter in this case (a warrantless search without probable cause) on the ground that it could have been something else (a warrantless arrest with probable cause), moreover, has unappealing ramifications not present in Charros and its progeny. Recruiting addicts to buy and inform in exchange for consideration in respect to their own legal difficulties is a risky and sometimes distasteful business, yet it seems to be a necessary tool in narcotics investigations. As currently practiced, it is at least minimally self-limiting: the informant is promised anonymity, meaning that s/he can only be used to develop probable cause for a search warrant application, not as a witness. The necessity of an application to a neutral magistrate, subject to review on a suppression motion, admits a modicum of sunshine and, occasionally, exposes abuse and even outright fraud. See Commonwealth v. Luna, 418 Mass. 749 (1994); Commonwealth v. Ramirez, 416 Mass. 41 (1993); Commonwealth v. Luna, 405 Mass. 566 (1989).
These checks and balances would evaporate were the search in this case, and others like it, adjudged lawful on the theory that probable cause to arrest may be substituted for a warrant and probable cause to search. As the defendant correctly observes, such a rule would authorize a sort of “search on sight”[9] or “catch-and-release”[10] program, in which a sufficiently accredited tip from a confidential informant would permit the police to stop and search a suspect anywhere, any time within the statute of limitations, any number of times — with no warrant, no probable cause to search, and no arrest — unless and until evidence of crime is found. The search warrant and the neutral magistrate would be remembered as quaint relics of the past, at least in investigations of the street-level narcotics trade. This is not, I think, what the Charros court, or the drafters of Article 14,[11] had in mind.
ORDER
For the foregoing reasons, the order of August 20, 2012, allowing the defendant’s Motion to Suppress, shall stand.
On the matter of bail: the defendant is to be released on his own recognizance.

 In the first motion he was joined by the driver of the Honda, co-defendant Endalew Kahassay.

 There is no disagreement that the defendant was stopped, detained, and searched. The warrant having been invalid, the Commonwealth has the burden of proving, by a preponderance of the evidence, an applicable exception to the warrant requirement. Commonwealth v. Antobenedetto, 366 Mass. 51, 57 (1974) (“where, as here, the search is without a warrant the burden of establishing its reasonableness is on the Commonwealth’’); see Care and Protection of Laura, 414 Mass. 788, 791-92 (1993) (generally, “preliminary questions of fact [in criminal cases] need only be proved by a preponderance of the evidence”).

 The male pronoun is used here for convenience only. The gender(s) of the CIs was not revealed, either at the hearing or in the search warrant affidavit.

 It bears reiterating that here, unlike the Eggleston case, the police did not have probable cause to search the Canny when they went looking for it; they acquired probable cause only as a result of detaining the defendant. See decision of 8/20/12 (Paper #21).

 The occasional court order to disclose an informant’s identity often results in dismissal of the case, the informant’s confidentiality being deemed more valuable than any single prosecution.

 Summers held that “for Fourth Amendment purposes .. . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.” Such a detention serves law enforcement interests in “preventing flight in the event that incriminating evidence is found,” giving the officers “unquestioned command so as to minimize the risk of harm to them or to the occupants, and keeping the occupants nearby to assisting opening locked doors or containers in the interest of preventing damage to property and prolongation of the search.” 452 U.S. at 701-03. None of these interests is served, however, when the occupants are unaware of the search and are stopped and detained away from the home.

 The wife had not been party to the controlled buys, so there was no probable cause to arrest her. The SJC held that a quantity of currency found in her purse at the stop ought to have been suppressed, that the error was not harmless, and that she was therefore entitled to a new trial. 443 Mass. at 765-67.

 Nor can this encounter be treated as if it were a lawful Terry stop. It was only after Det. Donofrio had laid hands on the defendant and was in the process of handcuffing him that the first contraband (the bag dropped to the ground) was discovered. Restraint, including handcuffs, do not automatically invalidate a Terry stop or convert it to an arrest, but there must be a legitimate and genuine reason for it, based on factors “including the length of the encounter, the nature of the inquiry, the possibility of flight, and the danger to the safety of the officers.” Commonwealth v. Williams, 422 Mass. 111, 118 (1996). Here, there was no particularized reason for concern over the possibility of violence or flight by the defendant.

 See Commonwealth v. Phillips, 413 Mass. 50, 56 (1992).

 See M. Parfitt, “Ouch! A new finding that fish feel pain has set off a tortured debate about the ethics of angling.” Smithsonian Magazine Nov. 2003, available at: http://www.smithsonianmag.com/science-nature/Ouchht mi.

 “Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws."