NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11924
SJC-11960


COMMONWEALTH  vs.  BRANDEN E. MATTIER
(and five companion cases[1]).



Suffolk.     January 7, 2016. - May 13, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.


Larceny.  False Impersonation & Identity Fraud.  Fraud.
Conspiracy.  Attempt.  Search and Seizure, Arrest.
Evidence, Identity, Fraud, Conspiracy.  Jury and Jurors.
Practice, Criminal, Motion to suppress, Jury and jurors,
Argument by prosecutor.



Indictments found and returned in the Superior Court
Department on August 29, 2013.

A pretrial motion to suppress evidence was heard by Kenneth
W. Salinger, J., and the cases were tried before Jeffrey A.
Locke, J.

The Supreme Judicial Court granted applications for direct
appellate review.


Rebecca A. Jacobstein, Committee for Public Counsel
Services, for Branden E. Mattier.

_____

[1] Two against Branden E. Mattier and three against Domunique
D. Grice.

William S. Smith for Domunique D. Grice.
Randall E. Ravitz, Assistant Attorney General (Gina M. Masotta, Assistant Attorney General, with him) for the Commonwealth.

HINES, J.  The defendants, Branden E. Mattier and his half-brother Domunique D. Grice, were convicted by a jury on indictments charging one count each of conspiracy to commit larceny, G. L. c. 274, § 7, and attempted larceny, G. L. c. 274, § 6.  Mattier also was convicted on an indictment charging one count of identity fraud, G. L. c. 266, § 37E.  The charges stemmed from an attempt by the defendants to defraud The One Fund Boston (One Fund) of approximately $2 million by claiming that a long-deceased aunt had been injured in the 2013 bombing at the finish line of the Boston Marathon.[2]  The judge imposed on each defendant a State prison sentence of from three years to three years and one day on the conspiracy count and three years' probation on the attempted larceny count, to run from and after the committed sentence.  Mattier was sentenced to an additional concurrent probationary term for his conviction of identity

---

[2] The One Fund Boston (One Fund) was established as a charitable organization to collect and distribute funds to assist the victims of the April, 2013, Boston Marathon bombing.

fraud. The defendants appealed, and we granted their applications for direct appellate review.[3]

Although the appeals were not formally consolidated, we have treated them as such, given the substantial congruence of the issues raised by the defendants.[4] Mattier contends that his conviction of identity fraud fails as a matter of law because the charged conduct is insufficient to meet the elements of the statute. Both defendants claim that the judge erred in (1) denying the motion to suppress evidence obtained as a result of Mattier's warrantless arrest for the identity fraud and attempted larceny charges; (2) denying the motions for required findings of not guilty on all charges; and (3) denying the motion to strike for cause jurors who donated to One Fund. Grice also challenges statements made by the prosecutor in closing argument.

We agree, for the reasons explained below, that Mattier's identity fraud conviction fails as a matter of law. Our ruling on the validity of the identity fraud conviction, however, does not compel the reversal of the conspiracy and attempted larceny

---

[3] Both defendants requested a stay of execution of their sentences, which were denied. Mattier filed a motion to stay, and the single justice denied relief. He appealed to the full bench of the Supreme Judicial Court, and we affirmed in Commonwealth v. Mattier, 474 Mass. 227 (2016).

[4] The Commonwealth filed a single brief to address both appeals.

convictions, because they are based on sufficient legally obtained evidence.  The claimed errors regarding the seating of jurors and the prosecutor's closing argument similarly are unavailing.

Background.  We recite the facts the jury could have found, reserving certain details for our discussion of the specific issues raised.  After two bombs exploded near the finish line of the Boston Marathon on April 15, 2013, One Fund was established.  See note 1, supra.  In early May, 2013, the administrator of One Fund held two community meetings to discuss distribution. Mattier and Grice attended one of the meetings, and Mattier registered on One Fund's Web site the following day.  On May 15, 2013, One Fund disseminated the claims protocol to those persons registered on One Fund's Web site.  The levels of payment were based on severity of injury, with the largest amount going to those victims who suffered double amputation.  The protocol required that a claimant submit a "hospital statement" confirming the dates of hospital treatment and the nature of the injury.  All claims were due by June 15, 2013.

One Fund received a claim form from Mattier on June 12, 2013, stating that Mattier's aunt had been injured in the bombing and had required double amputation as a result of her injuries.  Mattier requested that the claim disbursement check be made payable to him at his Boston address.  On June 7, he

signed the claim form as representative for his aunt, and his signature was notarized. Attached to the claim form was a signed letter purporting to be from Dr. Peter A. Burke, chief of trauma services at Boston Medical Center. The letter, dated May 2, 2013, stated that both of the aunt's legs had been amputated as a result of injuries from the marathon bombings.[5]

One Fund administrators suspected that Mattier's claim form might be fraudulent and conducted an internal investigation. After learning that the aunt died in 2000, they rejected the claim. One Fund administrators alerted the Attorney General's office of the false claim.

As part of the Attorney General's investigation into the matter, the police created a "sting" operation using an overnight courier to deliver a letter to Mattier's residence on July 1, 2013, which stated that the claim had been approved and a check would be arriving July 2, 2013. On July 1, police officers observed Mattier sign for and accept the letter outside his residence while holding his cellular telephone. Subsequently, the police officers obtained a search warrant for Mattier's residence and for Mattier himself at that location.

---

[5] On May 29, 2013, Mattier sent One Fund an electronic mail message in which he explained that his aunt had had one leg amputated and may need to have the other leg amputated.

On July 2, 2013, police conducted a controlled delivery of a fake check to Mattier. State police Trooper John Banik drove to Mattier's residence dressed as a Federal Express delivery driver in a white van bearing a Federal Express logo. Mattier was standing just outside his apartment building when Trooper Banik arrived. The two walked toward each other and met on the sidewalk in front of Mattier's apartment building. Trooper Banik asked Mattier to produce his driver's license and, after explaining that he was delivering a claim check, asked whether Mattier was injured in the bombings. Mattier responded that his aunt had been injured. The trooper copied Mattier's driver's license number onto his paperwork and handed Mattier the envelope. Other police officers in the area then surrounded Mattier and arrested him for identity fraud and attempted larceny.

During booking, Mattier's cellular telephone was placed into his property inventory. After being given the Miranda warnings, Mattier waived his rights and spoke with Trooper Banik. He admitted to submitting the claim on behalf of his long-deceased aunt and explained how he created the doctor's letter using forms obtained from the Internet. Trooper Banik obtained Mattier's cellular telephone from inventory, placed it in his office, and obtained a search warrant authorizing the search of the telephone.

The search produced hundreds of cellular telephone text messages between Mattier and Grice.  The brothers corresponded about One Fund on the day of the community meeting they had attended, expressed their joy at receiving news that their claim had been approved, and ruminated about the type of Mercedes Benz vehicle that each would buy using the funds awarded on their claim.  In one of the text messages, sent before Mattier created the forged letter regarding their dead aunt's claimed injuries, Grice wrote to Mattier:  "Subject: Auntie, Nevie Shelton ss# Hospitalized from 4-15-13 til 5-3-13 18 days. Yes to double amputation and permanent brain damage."

Discussion.  1.  Identity fraud.[6]  General Laws c. 266, § 37E (b), criminalizing identity fraud, provides:

> "Whoever, with intent to defraud, poses as another person without the express authorization of that person and uses such person's personal identifying information to obtain or to attempt to obtain money, credit, goods, services, anything of value, any identification card or other evidence of such person's identity, or to harass another shall be guilty of identity fraud and shall be punished by a fine of not more than $5,000 or imprisonment in a house of correction for not more than two and one-half years, or by both such fine and imprisonment."

---

[6] Although Grice was acquitted of this charge, he joins in the argument that the identity fraud conviction fails as a matter of law.  The applicability of the statute to Mattier's conduct underlies Grice's argument that evidence presented against him at trial was obtained pursuant to the warrantless arrest of Mattier, which was based on charges of identity fraud and attempted larceny.

The essential elements of the crime are that a defendant "(1) posed as another person; (2) did so without that person's express authorization; (3) used the other person's identifying information[7] to obtain, or attempt to obtain, something of value; and (4) did so with the intent to defraud." Commonwealth v. Giavazzi, 60 Mass. App. Ct. 374, 376 (2004). The essence of the Commonwealth's case was that Mattier downloaded a template of a letter from the Boston Medical Center onto his computer, composed a letter on the template, copied Dr. Burke's signature onto that letter, and then submitted the letter to One Fund together with his claim form.

The defendants challenge this conviction on the ground that the particular conduct at issue here was insufficient to establish the first and third elements of the crime. They argue that Mattier did not "pose" as Dr. Burke within the meaning of the statute and that even if he did, he did not obtain or attempt to obtain money from One Fund while posing as Dr. Burke.

---

[7] General Laws c. 266, § 37E (a), defines "[p]ersonal identifying information" as:

"any name or number that may be used, alone or in conjunction with any other information, to assume the identity of an individual, including any name, address, telephone number, driver's license number, social security number, place of employment, employee identification number, mother's maiden name, demand deposit account number, savings account number, credit card number or computer password identification."

In rebuttal, the Commonwealth argues that the evidence, taken in the light most favorable to it, Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979), was sufficient to prove that Mattier "pose[d]" as Dr. Burke because the language of the letter implicitly asserted that he, as drafter, was Dr. Burke and that the statute does not require proof that the posing occurred at the same time as the attempt to obtain funds. The trial judge, in denying the defendants' motions for a required finding of not guilty on the identity fraud charges, focused on the "pos[ing]" element and accepted that Mattier did not "directly" pose as Dr. Burke. He noted that the "statute is stretched in this case" because the defendants "did not represent themselves to be Dr. Burke at all. They used Dr. Burke's identity to validate their intended fraud." He then concluded that the jury should decide whether Mattier "indirectly posed as [Dr. Burke] by inserting that dummied up letter."

The issue before us is whether, on the facts of this case,[8] Mattier's conduct is encompassed within the reach of the

---

[8] This case differs factually from the typical identity fraud scenario. See, e.g., Commonwealth v. Catalano, 74 Mass. App. Ct. 580, 581 (2009) (unauthorized use of another's name to open gas and electric accounts violated identity fraud statute). In Commonwealth v. Clark, 446 Mass. 620, 625 (2006), we reviewed the legislative purpose in enacting the identity fraud statute and explained:

statute. When the meaning of a statute is at issue, "[w]e begin with the canon of statutory construction that the primary source of insight into the intent of the Legislature is the language of the statute." International Fid. Ins. Co. v. Wilson, 387 Mass. 841, 853 (1983). Where "the statutory language '[could] plausibly be found to be ambiguous,' the rule of lenity requires the defendant[s] be given 'the benefit of the ambiguity.'" Commonwealth v. Constantino, 443 Mass. 521, 525 (2005), quoting Commonwealth v. Carrion, 413 Mass. 44, 45-46 (2000).

We agree with the defendant's argument that he did not "pose" as another person in the manner contemplated by the statute. General Laws c. 266, § 37E (a), defines "[p]ose" to mean "falsely represent[ing] oneself, directly or indirectly, as another person or persons." Where G. L. c. 266, § 37E, does not define the phrase "falsely represent," we interpret the term in accordance with "approved usage of the language" (citation omitted). Commonwealth v. Hinds, 437 Mass. 54, 63 (2002), cert. denied, 537 U.S. 1205 (2003). In that regard, other cases

"The primary, but not sole, focus of [G. L. c. 266,] § 37E is (a) to criminalize the unauthorized use of someone else's personal identifying information to obtain fraudulently anything of value while posing as such other person, and (b) to criminalize the possession of such personal identifying information without authorization and with intent to pose as such other person to obtain fraudulently anything of value. It also criminalizes the misappropriation of such information to harass another."

interpreting allegations of false representations require the existence of another party on the receiving end of the representation.  See Commonwealth v. McCauliff, 461 Mass. 635, 638-639 (2012) (larceny by false pretenses); McEvoy Travel Bur., Inc. v. Norton Co., 408 Mass. 704, 712 (1990) (fraud); Schleifer v. Worcester N. Sav. Inst., 306 Mass. 226, 228 (1940) (deceit).  Accordingly, we interpret the phrase "falsely represent" in G. L. c. 266, § 37E, to require the Commonwealth to prove that a defendant "pose[d]" as Dr. Burke in his dealings with a third party, One Fund.

Here, the operative act for the purposes of the identity fraud charge was the submission of a forged letter, purportedly written by Dr. Burke, to One Fund.  Although Mattier misrepresented the authenticity of the letter to One Fund in claiming that the letter was from Dr. Burke, nothing in the evidence establishes that he ever falsely represented himself to be Dr. Burke.[9]  Mattier submitted the claim form to One Fund under his own name; he did not falsely represent to One Fund

---

[9] The language of the statute that allows an "indirect" misrepresentation does not alter our conclusion.  G. L. c. 266, § 37E (a).  A false representation may be made directly, e.g., face to face contact; or it may be made indirectly, e.g., through an electronic program where a person enters the credit card number of another attempting to act as the owner of that card.  A false representation that solely relates to the authenticity of a document instead of one's identity, however, is insufficient to support a conviction of identity fraud.

that he was Dr. Burke at the time that he submitted the letter.[10]
Thus, Mattier's deception does not fall within the scope of the
identity fraud statute; his criminal deception was properly
charged as attempted larceny.[11,12]

2. <u>Motion to suppress</u>. The defendants next argue that the
judge erred in denying the motion to suppress the evidence
obtained as a result of Mattier's warrantless arrest for

---

[10] A forged letter could provide the basis for an identity
fraud conviction under different circumstances. If Mattier had
presented himself to a third party as Dr. Peter Burke when
signing the letter or assumed another's identity in order to
obtain the Boston Medical Center letterhead, then his conduct
could have satisfied the requirement that he assume another's
identity. Those situations did not occur here.

[11] Moreover, even assuming that G. L. c. 266, § 37E,
applied, Mattier's conviction cannot stand where the jury were
required to speculate on the meaning of an essential element of
identity fraud. "Statutory interpretation is a pure question of
law," <u>Commonwealth</u> v. <u>Cintolo</u>, 415 Mass. 358, 359 (1993), and
all reasonable interpretations of an ambiguous statute are
resolved in favor of the defendants under the rule of lenity,
<u>Constantino</u>, 443 Mass. at 525. The jury must be instructed on
the legal meaning of a criminal statute in order to determine
whether a violation occurred. <u>Commonwealth</u> v. <u>Niziolek</u>, 380
Mass. 513, 527 (1980). Here, the jury were not instructed on
the meaning of "indirectly" posing. Although the judge
instructed the jury in accordance with the model instructions,
more was required under the facts of this case, where, as the
judge acknowledged, the meaning of indirectly posing was central
to determining whether the defendants could be found guilty of
the offense.

[12] Because we conclude that Mattier's conduct was
insufficient to satisfy the first element of identity fraud, we
need not analyze whether the posing and use of personal
identifying information must occur simultaneously.

identity fraud and attempted larceny.[13] They argue that the arrest was unlawful because the police lacked probable cause to make an arrest for identity fraud where the alleged conduct was insufficient as a matter of law to prove a violation of the identity fraud statute,[14] and the warrantless arrest for attempted larceny, a misdemeanor, cannot be justified in the absence of an applicable statute or a breach of peace.[15] They posit that the evidence -- text messages retrieved from the cellular telephone seized from Mattier's person after the arrest and statements by Mattier during postarrest interrogation -- is the fruit of the unlawful arrest and that it should not have been admitted at trial.

---

[13] Grice adopted Mattier's argument on the claim of error in the denial of the motion to suppress evidence obtained from the cellular telephone.

[14] The identity fraud statute directly authorizes a police officer to "arrest without warrant any person [the officer] has probable cause to believe has committed the offense of identity fraud as defined in this section." G. L. c. 266, § 37E (e).

[15] In the absence of a statute, police may arrest an individual without a warrant for a misdemeanor if the individual's actions "(1) [constitute] a breach of the peace, (2) [are] committed in the presence or view of the officer, . . . and (3) [are] still continuing at the time of the arrest or are only interrupted so that the offense and the arrest form parts of one transaction." Commonwealth v. Jewett, 471 Mass. 624, 630 (2015), quoting Commonwealth v. Howe, 405 Mass. 332, 334 (1989).

Mattier filed a motion to suppress before trial asserting these claims,[16] which the judge denied after an evidentiary hearing. "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of [his] ultimate findings and conclusions of law.'" Commonwealth v. Craan, 469 Mass. 24, 26 (2014), quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004). The motion judge rejected Mattier's claim that forgery alone could not subject him to the identity fraud statute and concluded that police had probable cause to arrest for identity fraud. Further, the judge concluded that seizure of Mattier's cellular telephone was lawfully authorized by the search warrant.

We agree with the judge that the seizure of Mattier's cellular telephone was lawful because the search of Mattier and the seizure of his cellular telephone was expressly authorized in the search warrant, the defendants appropriately do not challenge that the search warrant contained sufficient probable cause to believe that Mattier committed attempted larceny, and police could lawfully seize Mattier for the duration of the search. Relying on Commonwealth v. McCarthy, 428 Mass. 871

---

[16] Mattier also claimed that his statements should be suppressed because his Miranda waiver was not voluntary. Mattier does not renew this argument on appeal.

(1999), Mattier argues that the seizure of his cellular telephone was unlawful because Mattier's presence on the sidewalk in front of his apartment when he was approached by police placed him outside the scope of the search warrant. In McCarthy, supra at 873, 876, we concluded that the search of a vehicle was unlawful where, although a search warrant authorized the search of a particular residence, the vehicle was outside the residence's curtilage when it was searched, and the vehicle was not specifically authorized by the warrant.[17]

Mattier's reliance on the McCarthy case is unavailing, however, because the search of Mattier's person was lawful for a different reason. Specifically, the police were authorized to detain Mattier during the search of his apartment and the discovery of his cellular telephone was inevitable under that authority. Commonwealth v. Catanzaro, 441 Mass. 46, 52 (2004). "[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Id., quoting Michigan v. Summers, 452 U.S. 692, 705 (1981).

---

[17] We also noted, however, that the police only sought "authority to search the apartment" and "this problem could have been avoided altogether had the police included the vehicle in the application for the search warrant." Commonwealth v. McCarthy, 428 Mass. 871, 872 & n.3 (1999).

This "limited authority" expands to occupants found outside the premises and its curtilage in certain circumstances.  Cf. Commonwealth v. Charros, 443 Mass. 752, 760-761, cert. denied, 546 U.S. 870 (2005).  The United States Supreme Court, in Summers, supra at 702-703, identified three law enforcement interests that justify expanding this authority:  (1) "preventing flight in the event that incriminating evidence is found"; (2) "minimizing the risk of harm to the officers"; and (3) "the orderly completion of the search [that] may be facilitated if the occupants of the premises are present."  We have included the middle of an "alley or driveway" common to an occupant's apartment complex as within this authority where the occupant was first observed on the front steps of her apartment. Catanzaro, 441 Mass. at 48-49, 52-53 & n.12.  Conversely, we have excluded from this authority seizure of occupants at a location one mile away from the premises to be searched, because it did not serve the first two of these law enforcement interests and the third -- orderly execution of the warrant -- could have been served by executing the warrant when police knew the occupants would be home.  See Charros, 443 Mass. 762, 764. Moreover, the warrant generally authorized "any persons present" but did not specifically name the persons who were seized.  Id. at 760 n.5.

In this case, police were authorized to search and detain Mattier under the authority of the warrant because the facts known to police demonstrated that he was an occupant of the apartment to be searched, his location when the police approached had a "meaningful relation" to the apartment, and his detainment served the law enforcement interests identified in Summers. See Charros, 443 Mass. at 764; Catanzaro, 441 Mass. at 51-52. Mattier's driver's license address was that of the apartment authorized for search, Mattier was standing in front of that building when Trooper Banik first observed him, he produced his driver's license to Trooper Banik, and he was seized within "fifteen to twenty yards" of that building. Moreover, seizure of Mattier served law enforcement interests because he was aware of the warrant, was standing on the sidewalk in front of his home, and could have conceivably attempted to flee, harmed the police officers, or disrupted the search. See Summers, 452 U.S. at 702-703.

Although police arrested Mattier instead of detaining and searching him, evidence from the cellular telephone was admissible because the telephone inevitably would have been discovered. Commonwealth v. Balicki, 436 Mass. 1, 16 (2002). "Under the inevitable discovery doctrine, if the Commonwealth can demonstrate by a preponderance standard that discovery of the evidence by lawful means was certain as a practical matter,

the evidence may be admissible as long as the officers did not act in bad faith to accelerate the discovery of evidence, and the particular constitutional violation is not so severe as to require suppression." Commonwealth v. Sbordone, 424 Mass. 802, 810 (1997), citing Commonwealth v. O'Connor, 406 Mass. 112, 117-118 (1989). This is a "demanding test." Balicki, supra, quoting Commonwealth v. Perrot, 407 Mass. 539, 548 (1990).

Here, it is certain as a practical matter that the cellular telephone inevitably would have been discovered had the police seized Mattier for the duration of the search instead of arresting him because the police were looking for mobile devices, had seen Mattier carrying his cellular telephone the prior day, and were specifically authorized to search Mattier's person. See O'Connor, 406 Mass. at 118. Moreover, the police did not act in bad faith to accelerate the discovery of evidence. Before they arrested Mattier, police had obtained a search warrant, which contained sufficient probable cause to believe that Mattier committed the offense of attempted larceny. Therefore, even assuming that the arrest was unlawful, the police had authority at that time to seize Mattier's cellular

telephone. Accordingly, there was no error in admitting evidence obtained from the cellular telephone at trial.[18]

Mattier also argues that his postarrest statements must be suppressed. We need not consider the merits of this argument because admission of the statements was not prejudicial in light of other overwhelming evidence, including the cellular telephone text messages exchanged by the defendants, the claim form, the forged letter, and statements Grice made to a Red Cross representative (discussed infra). This evidence was sufficient to support the attempted larceny and conspiracy convictions.

3. Conspiracy and attempted larceny. Grice argues that the judge erred in denying his motion for a required finding of not guilty on the conspiracy to commit larceny and attempted larceny charges.[19] Grice concedes knowledge of the plan and interest in deriving reward from the proceeds, but claims that the evidence falls short of proving his intent that the crime be committed. Relying on Commonwealth v. Smith, 342 Mass. 180, (1961), Grice argues that his convictions must be vacated because the evidence "tends equally to sustain either of two

---

[18] Because of our disposition, we do not address the Commonwealth's argument regarding alleged procedural deficiencies in Grice's claim.

[19] Mattier adopted Grice's arguments on this issue as contained in Grice's brief pursuant to Mass. R. A. P. 16 (j), 365 Mass. 860 (1974).

inconsistent propositions, neither of them can be said to have been established by legitimate proof."  Id. at 183, quoting Commonwealth v. Carter, 306 Mass. 141, 147 (1940).

Because Grice's convictions were based on his role as a joint venturer, "the Commonwealth was required to prove to the jury that 'the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense.'"  Commonwealth v. Tavares, 471 Mass. 430, 434 (2015), quoting Commonwealth v. Zanetti, 454 Mass. 449, 468 (2009).  "'The defendant's intent may be inferred from his knowledge of the circumstances and participation in the crime,' . . . and any inferences drawn 'need only be reasonable and possible, and need not be necessary or inescapable'" (citations omitted).  Tavares, supra.

Reviewing the evidence in the light most favorable to the Commonwealth, Latimore, 378 Mass. at 676-677, we conclude that there was sufficient evidence to show that Grice knowingly participated in the crimes of attempted larceny and conspiracy to commit attempted larceny, and he intended that they be completed.  The Commonwealth presented evidence that Grice attended meetings regarding One Fund, attended an event honoring the victims, communicated with claims representatives, and communicated with Mattier about the crimes through text message. After protocols for distribution of funds based on severity of

injury were released, Grice wrote to Mattier referencing their dead aunt, "Yes to double amputation and permanent brain damage." Subsequently, Mattier sent Grice a message asking if they should attend a ceremony being held to honor the victims, Grice responded, "Yessir. Gotta get dis money," and the two attended the event. There, Grice gave a Red Cross representative his contact information to obtain information about additional claim resources after the brothers, with Grice doing most of the talking, told the representative "that their aunt had had a leg amputated, and that she was going to need the other leg amputated as well." The Commonwealth is not required to disprove every alternative theory "if the record viewed in its entirety supports 'a conclusion of guilt beyond a reasonable doubt.'" Commonwealth v. Platt, 440 Mass. 396, 401 (2003), quoting Commonwealth v. Merola, 405 Mass. 529, 533-534 (1989).

In light of the even more persuasive evidence against Mattier, we reject his claim as well.

4. Juror bias. Grice and Mattier argue that their rights under the Federal and State Constitutions were violated by the trial judge's denial of the motion to excuse for cause jurors whom they claim were biased by their donations to One Fund

(donating jurors).[20]  During voir dire, the judge asked each juror, "Have you or a member of your family raised any money for or contributed to or filed a claim with or received funds from the Boston One Fund?"  Over objections, the judge denied Grice and Mattier's motions to strike two donating jurors for cause. The judge explained that the mere act of donating was not sufficient for a juror to be excused for cause so long as the jurors credibly stated that they could be objective.[21]

The judge excused four donating jurors for cause where the jurors did not explicitly say that they could be indifferent. In one instance, the judge found a juror to be indifferent notwithstanding the fact that he and his firm had donated to One Fund.  After being alerted by Mattier's counsel that the juror's firm had donated $1 million to the fund, the judge noted that he was going to "err on the side of caution," and he excused this juror for cause.  Two donating jurors sat on the deliberating jury.[22]

---

[20] Mattier adopted this argument as set forth in Grice's brief pursuant to Mass. R. A. P. 16 (j).

[21] The judge stated that, "there are thousands of Massachusetts citizens who have contributed to the Boston One Fund.  I'm not sure that that standing alone disqualifies all of them from jury service in this case."

[22] The defendants exercised five of their ten combined peremptory challenges against jurors who had donated.  The defendants did not exercise peremptory challenges against the

"Article 12 of the Declaration of Rights of the Massachusetts Constitution and the Sixth Amendment to the United States Constitution, applied to the States through the due process clause of the Fourteenth Amendment, guarantee the right of a criminal defendant to a trial by an impartial jury." Commonwealth v. Andrade, 468 Mass. 543, 547 (2014), quoting Commonwealth v. McCowen, 458 Mass. 461, 494 (2010). "The presence of even one juror who is not impartial violates a defendant's right to trial by an impartial jury." McCowen, supra, quoting Commonwealth v. Vann Long, 419 Mass. 798, 802 (1995). "The defendant has the burden of showing that the juror was not impartial and must do so by a preponderance of the evidence." Commonwealth v. Amirault, 399 Mass. 617, 626 (1987).

"On a claim of structural error alleging that a jury were not impartial because a particular juror was biased, the defendant must show actual or implied juror bias." Commonwealth v. Hampton, 457 Mass. 152, 163 (2010). In deciding whether a juror is actually biased, "it is sufficient for the judge to 'determine whether jurors [can] set aside their own opinions, [properly] weigh the evidence . . . and follow the instructions of the judge.'" Andrade, 468 Mass. at 547-548, quoting

---

two donating jurors who sat on the deliberating jury even though both defendants had challenges remaining when those jurors were selected.

Commonwealth v. Perez, 460 Mass. 683, 688-689 (2011).  We review for "clear abuse of discretion or a showing that the judge's findings were clearly erroneous."  Commonwealth v. Torres, 437 Mass. 460, 469 (2002), quoting Amirault, 399 Mass. at 626.  This is because such a determination "is essentially one of credibility, and therefore largely one of demeanor."  McCowen, 458 Mass. at 493, quoting Commonwealth v. Ferguson, 425 Mass. 349, 352-353 (1997).

After a careful review of the record, we conclude that the judge did not abuse his discretion in finding that the jurors were not actually biased.  The jurors either responded with a direct "No" when asked whether the contribution would affect his or her ability to be objective or were further questioned until the judge was satisfied that each juror could be objective.

The more difficult question is whether donations to One Fund created an implied bias in donating jurors.  Grice argues that donating jurors had an implied bias because of the close connection between the jurors' donations to One Fund and the allegations that the defendants attempted to steal from that same fund.  Moreover, Grice asserts that the trial judge, during

sentencing, confirmed why the jurors should have been removed when he stated that the defendants had "victimized all donors."[23]

For the defendant to prevail on a claim of implied bias, we "must be satisfied that it is more probable than not that the juror was biased against the litigant."  Amirault, 399 Mass. at 630, quoting State v. Wyss, 124 Wis. 2d 681, 730 (1985).  We have recognized certain extreme circumstances where implied bias could be found:  (1) where "it is disclosed that 'the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction'"; (2) in "a case where the trials of codefendants are severed and an individual observes the first trial and sits as a juror in the second trial"; and (3) where "a juror who has been the victim of a similar crime and has consciously concealed that fact from the parties or the court."  Amirault, 399 Mass. at 628 n.5, quoting Smith v. Phillips, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring).

In addition to the examples cited in Amirault, other jurisdictions have recognized certain circumstances where a

---

[23] After the defendants' statements of apology during sentencing, the judge responded that it was "absolutely shocking" that neither recognized "the broader community of victims in this case," which he said included donors and those actually injured.

juror's personal stake or substantial interest in the outcome of the case can demonstrate implied bias. "[E]ven a tiny financial interest in the case" has required a juror to be excused for cause. United States v. Polichemi, 219 F.3d 698, 704 (7th Cir. 2000), cert. denied, 531 U.S. 1168 (2001). Accordingly, courts have presumed bias in stockholders of for-profit corporations that are parties in a lawsuit. Getter v. Wal-Mart Stores, Inc., 66 F.3d 1119, 1122 (10th Cir. 1995). Conversely, courts have not found an implied bias in members of a for-profit retail club because the club "membership is still worth the same after a judgment adverse to [the club]." Guerra v. Wal-Mart Stores, Inc., 943 S.W.2d 56, 59 (Tex. Ct. App. 1997).

In this case, it is clear that the jurors did not have a financial interest in the outcome of the case. A charitable contribution does not constitute a financial interest because a donation does not grant any ownership interest in a charitable fund. See United States v. Arena, 918 F. Supp. 561, 578 (N.D.N.Y. 1996) (rejecting assertion that wife's donation to victim, a charitable organization, caused bias in judge). Additionally, the outcome of the case would not affect the viability of One Fund. Indeed, the case had no financial effect on One Fund because the defendants failed to obtain any money from the charity. Notwithstanding the judge's comments during sentencing, One Fund donors were not victims of the defendants'

crimes, nor did they have any financial interest in the charitable organization by way of their contributions.

Accordingly, we conclude that the jurors' connection to the charitable fund targeted by the defendants is too attenuated to cause their disqualification as a matter of law.  See Searle v. Roman Catholic Bishop of Springfield, 203 Mass. 493, 498 (1909) (rejecting contention that all jurors of Roman Catholic faith should be disqualified from jury in property dispute lawsuit against defendant Roman Catholic Bishop of Springfield where no jurors were taxpayers of town or members of local parish).  The notion of implied bias has been used sparingly.  See, e.g., United States v. Torres, 128 F.3d 38, 46 (2d Cir. 1997), cert. denied sub nom. Rivera v. United States, 523 U.S. 1065 (1998) ("situations in which a trial judge must find implied bias are strictly limited and must be truly 'exceptional'").  The judge's decision to excuse one juror whose firm donated $1 million does not require us to find otherwise.  Although only "extreme" situations require a finding of implied bias, a judge has discretion to remove a juror out an abundance of caution where there is a possible inference of bias but no actual or implied bias.  See id. at 47.  The defendants have not met their burden to show actual or implied bias on the part of any juror.

5.  Prosecutor's closing argument.  Last, Grice argues that he was prejudiced by the prosecutor's description, during his

closing argument, of the law regarding coconspirators' statements. We recognize, as an exception to the hearsay rule, that a statement made by a coconspirator or joint venturer may be admitted for its truth against the other coconspirators or joint venturers. Mass. G. Evid. § 801(d)(2)(E) (2016). See Commonwealth v. Braley, 449 Mass. 316, 319-320 (2007). The exception applies only if the existence of the conspiracy or joint venture is shown by evidence independent of the statement. Id. Grice does not reference any particular statement made by the prosecutor, but we note the following passage where the prosecutor stated, "you can use [certain described text messages sent by Mattier and Grice] to show that these two defendants conspired to steal 2.2 million dollars from the One Fund."

"In determining whether an error in closing argument requires reversal, we consider whether defense counsel made a timely objection; whether the judge's instructions mitigated the error; whether the error was central to the issues at trial or concerned only collateral matters; whether the jury would be able to sort out any excessive claims or hyperbole; and whether the Commonwealth's case was so strong that the error would cause no prejudice." Commonwealth v. Scesny, 472 Mass. 185, 203 (2015), quoting Commonwealth v. Scott, 470 Mass. 320, 335 (2014). Although Grice did object to the prosecutor's

statements at the end of closing, the remaining factors do not support reversal.

The judge instructed the jury on the proper rule of law several times, both before and after closing arguments. The judge elaborated on the instructions at Grice's request. The prosecutor correctly described the rule of law in his closing argument following the challenged statement. Moreover, the Commonwealth had a strong case against Grice using only Grice's own statements and his attendance at events.

6. Conclusion. We affirm the convictions of attempted larceny and conspiracy against Grice and Mattier. Because we conclude that the evidence was insufficient to convict Mattier of identity fraud, we vacate that conviction and order entry of a judgment of not guilty. We do not remand to the Superior Court for resentencing, where Mattier's sentence is unlikely to be affected by our decision.[24]

So ordered.

---

[24] The judge issued concurrent sentences of probation on Mattier's identity fraud conviction and his attempted larceny conviction. Except for the concurrent sentence on the identity fraud conviction, Mattier and Grice received the same sentences. Grice's sentence demonstrates that the judge did not enhance any other portion of Mattier's sentence based on the identity fraud conviction.